Davie vs. Levy & Sons.

---

### No. 9822.

### WASHINGTON DAVIE VS. M. LEVY & SONS.

If the *interference* of the employer in the work, or any of its details, results in the doing of anything, as a part of the work, from which damage ensues to another, the employer is liable.

If one permits the establishment of a public nuisance upon property *under his control*, though incidental to a work otherwise lawful, he will be liable.

When an obstruction or defect, caused or created in a public street, is purely *collateral* to the work contracted to be done, and is entirely the result of the wrongful acts of the contractor or his workmen, the *employer is not liable*.

APPEAL from the Civil District Court for the Parish of Orleans. *Monroe, J.*

*W. S. Benedict* and *Branch K. Miller* for Plaintiff and Appellee.

*Braughn, Buck, Dinkelspiel & Hart* for Defendants and Appellees.

---

The opinion of the Court was delivered by

WATKINS, J. This is an action for the recovery of $15,000 damages from defendants, on the grounds stated in the petition of plaintiff, viz:

Plaintiff was a member of a fire company composing, along with the members of other companies, the Firemen's Charitable Association, which, at the time of the occurrence of the facts stated in this petition, was under a contract with the city of New Orleans to extinguish fires. That the duty of extinguishing fires under said contract was actually performed by the members of plaintiff's fire company, who were also members of the Firemen's Charitable Association.

That plaintiff, while on his way to a fire, riding upon the truck of his company, along a public street, in accordance with his duty, to aid as a member of said two organizations, in the extinguishment of the said fire, on a dark night, about 11 o'clock, was knocked off of the truck by a "coal run;" which was a sort of bridge built across the said street at about an average height of eight feet from the level of the street, leading from the coal yard, owned and operated by defendants, across said street and to the water's edge of the Mississippi river, on a street fronting which said coal yard was situated. Plaintiff charges that said "coal run" was erected by defendants without authority, and was a public nuisance established by defendants. An ordinance of the city is pleaded, permitting fire engines to proceed to fires, at such rate of speed as the drivers thereof may deem necessary.

This suit is for damages caused by his being knocked off of the truck by said "coal run," under the circumstances detailed in the petition.

The defence is: 1st. Contributory negligence, consisting of plaintiff's riding upon the said truck on his way to the fire; 2d. That said truck could have passed under said run without damage to plaintiff, if carefully driven; 3d. That the driver of the truck was warned not to pass under said "coal run;" 4th. That defendants had employed a competent contractor to put into said coal yard, from a flatboat lying opposite in the river, a quantity of coal; that for this purpose said contractor erected said "coal run;" that defendants reserved no control over said contractor; that said contractor alone was responsible to plaintiff.

I.

As the court below sustained defendants' last ground of defense, and rejected the plaintiff's demands, we will examine it first.

We find in the record the lucid and elaborate opinion of one of our learned brother of the district bench, who seems to have attended most carefully to all the facts of the case, and we have made the following extracts therefrom, viz:

There was on North Peters street "a coal-run, or bridge, which had been put, and was used (temporarily) as a passage for coal wheelers, who were engaged (not at the moment, but during the day) in discharging a boat-load of coal from a barge in the river, to the yard of the defendants, which faced the street at that point.

"The coal barge in question, as well as I can gather from the testimony, was distant from defendant's yard between seventy-five and one hundred feet, of which about thirty was made up of the street proper

or roadway, and the balance, of the banquette next the coal yard on one side, and the levee on the other.

"Upon each side of the roadway was a trestle—the one nearest the river being about seven and a half, or eight feet high ; and the other nearest the yard, on the edge of the banquette, being about ten feet, or more, high.

"From the coal barge, across the levee, and ascending over these trestles was a continuous line of staging, or planking, across which the coal was wheeled, *over defendants' fence and into their yard.*

"This 'run,' as it is called, had been put up the day before the accident, and had been used the whole of that day. A baker's wagon had, however, come in contact with it, as at first constructed, with some damage to the top ⁎ ⁎ and it had been raised, where it spanned the street, some five or six inches ; after which vehicles of various kinds passed under it without difficulty.

⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎

Again : "The evidence shows that for many years past the coal dealers of this city, who have their yards on the levee, have had the coal, they buy in barges in the river, discharged into their yards by contract; and that there are men, whose business it is to take such contracts, and who engage to furnish the labor, the implements and the material necessary to the work, and to transfer the coal, from the barge to the yard, at rates varying from three to four cents per barrel.

"It is further shown that defendants made such a contract with Pendleton Harris, and that Harris agreed to transfer about 9000 barrels of coal, from a barge which defendants had bought—and which was then lying in the river in front of their yard—into their yard at the agreed price of 3¼ cents per barrel ; Harris to furnish everything necessary to the work, and to receive his pay, when it should be completed.

"That Harris has been in the business, as a contractor, for about nine year, and is regarded as a competent and reliable man; and that it is a common and every-day occurrence for him, and other contractors, to build these runs, from the levee to the different yards, in order to carry the coal up, and make a pile of it, rather than spread it out over, perhaps, more space, that the yard would afford.

"One of the defendants testifies that he told Harris, when the contract was made, that he (Harris) must so deposit the coal in the yard, as to leave room for two carts to turn round and get on the scales ; and that this was *part of the contract,* as originally made.

"Harris, upon the other hand, testifies that, *after a portion of the coal had been discharged*, Marks Levy called his attention to the fact that he was *crowding their scales;* and told him then that he must leave the required space; that he (Harris) replied that he could only do so by putting up a run; and that Levy said * * that he must have the room for his carts to turn around, and get on the scales.

"There are several witnesses, employed by Harris as coal wheelers, who corroborate Harris; and even go much further.

"They testify that *Levy distinctly ordered* Harris to put up the run; pointed out the trestles, and told Harris to use them; and actually assisted in putting in a block to aid in the construction of the run.

"I am unable, however, to attach to this testimony the weight (that) is claimed for it.

"To put the coal in the yard *properly* was as much a part of Harris' contract, as to put it in at all; and he was equitably bound to furnish the appliances to put it in properly, as to furnish the wheel barrows and shovels, by means of which it was taken from the barge.

"It would be absurd to say that it would have been a *proper delivery* of the coal for him to have so *obstructed* the yard with it, as to prevent defendants' carts from reaching the scales, or entering, or turning around in the yard; and, more especially, as the evidence goes to show that it is an *understood part of such contracts* that the dealer shall designate in what part of his yard the coal is to be deposited. Nor can there be any dispute that such was the case in this instance.

"Whether Levy told Harris *before* the work began, or *after* it, that the space must be left, his right to insist upon this requirement, as part of the contract, was never, for a moment, questioned.

"There was then no reason why Levy should give any special instructions as to the manner in which the coal should be discharged; it was a matter that did not concern him, and in which he had absolutely *no right to interfere;* and Harris, who is a much more intelligent man than the laborers who worked for him, testifies positively and repeatedly that the *order to put up the run consisted merely in the fact that Levy required him to leave room for his carts around the scales,* and that in order to do so *he was obliged to resort to the run;* and that when he told Levy that he would have to put up the run, *Levy replied that he did not care how he put the coal in, so that it was done.*"

* * * * * * * * *

We have taken occasion to verify this statement of facts by making a careful examination of and a comparison with the record, and feel perfectly satisfied that it is substantially accurate.

## II.

This defence is resisted by the plaintiff on the theory that : 1st. " If the *interference of the employer* in the work, or any of its details, results in the doing of anything as a part of the work, from which damage ensues to another, the employer is clearly liable, since he who *directs*, or in any manner participates in a *tort*, is liable as principal therein."

2d. " If one permits the establishment of a public nuisance *upon land or property under his control*, though incidental to a work otherwise lawful, he will be liable for any damage caused by it, though such public nuisance be actually erected by an independent contractor."

These two propositions are supported by the cited authorities ; but the difficulties in plaintiff's way are rather those of *fact* than of *law*.

In our opinion, the evidence does not show that defendants *interfered* with the contractor " in the work or any of its details."

It does not show that defendants *permitted* the establishment of a public nuisance at all ; or if at all, " *upon land or property under their control*."

The interfering "run" whereby the accident happened to the plaintiff, was erected upon cribs or movable piers that stood on either side of a *public street* or highway, which was spanned or bridged overhead, at a height of eight to ten feet with plank or scantling. The coal was wheeled from the coal barge in wheelbarrows over this trestle, and poured or *dumped off* into defendants' coal yard in a pile or heap.

The claim of the plaintiff is " that he was knocked off of the truck by a 'coal-run,' which was a sort of a *bridge built across the said street*."

Again : "Plaintiff charges that said 'coal-run' was *erected by defendants* without authority, and was a public nuisance established by defendants."

The case of Robins vs. Chicago City, 4 Wallace, 679, is precisely in point and in exact parallel with the one at bar.

The Court say :

" When the obstruction or defect caused or created *in the street*, is purely collateral to the work contracted to be done, and is entirely the result of the wrongful acts of the contractor or his workmen, the rule is that the *employer is not liable;* but where the obstruction or defect which occasioned the injury, results *directly* from the acts which the contractor agrees and is authorized to do, the person who employs the contractor and *authorizes him to do those acts* is equally liable to the injured party." Citing 23 Pickering, 24 ; 17 N. Y. 104 ; 16 Wallace, 567, Water Company vs. Ware.

A similar principle has been recognized by this Court in the case of Sweeny vs. Murphy, 32 Ann. 628, in which it was held, that "the master and owner of a ship, having contracted with a competent stevedore to load her and not having contracted or directed, in any manner, the laborers employed in the loading, are not responsible for injuries resulting from the negligence of said laborers." 29 Ann. 791, Catherine Riley vs. State Line Steamship Company.

We therefore conclude with the district judge who tried this case that, if damage results from the *manner* in which a contractor chooses to execute a perfectly valid contract, without the proprietors' *interference* or *direction*, the latter is not responsible therefor.

If, in the performance of the contract by the contractor, in the manner that has been pursued ordinarily by persons of that occupation, damage result, it will be considered collateral only to the contract, and not an incident of it for which the proprietor is responsible.

Judgment affirmed.