364 So.2d 604 (1978)
Dave Haas EWELL et al.
v.
PETRO PROCESSORS OF LOUISIANA, INC., et al.
No. 12167.
Court of Appeal of Louisiana, First Circuit.
October 9, 1978.
Rehearing Denied November 20, 1978.
Writ Refused January 19, 1979.
*605 Bryant W. Conway, Baker, Maurice J. Wilson, Jr., Baton Rouge, counsel for plaintiff-appellant Dave Haas Ewell, Jr., et al.
Charles W. Phillips, John R. Tharp, Baton Rouge, counsel for defendant-appellee Allied, Ethyl and Shell Corp.
Roger M. Fritchie, Baton Rouge, counsel for defendant-appellee Exxon Corp.
Edward F. Glusman, Baton Rouge, counsel for defendant-appellee Foster Grant Co. and Liberty Mutual Ins. Co.
R. Gordon Kean, Jr., Baton Rouge, counsel for defendant-appellee Uniroyal, Inc.
John Swanner, A. J. Seale, Baton Rouge, counsel for defendant-appellee Dow Chemical Corp.
Paul Marks, Jr., Baton Rouge, counsel for defendant-appellee Copolymer Corp.
John Dale Powers, Baton for defendant-appellee Petro Processors of La., Inc.
Before ELLIS, BLANCHE and LOTTINGER, JJ.
ELLIS, Judge.
Dave Haas Ewell, Jr. and his children together own an undivided one-eighth interest in an 1100-acre tract of land lying between Scenic Highway and the Mississippi River, north of Baton Rouge. Approximately 550 acres of the tract lie below the 35-foot contour line and form part of Devil's Swamp. Baton Rouge Bayou Bayou flows into Devil's Swamp from the northeast, entering the swamp at or near the north line of plaintiffs' property.
The property of Petro Processors, Inc. of Louisiana adjoins that of plaintiffs on the north, near the point where Baton Rouge Bayou enters the swamp, and occupies the bluff where the high ground meets the Devil's Swamp, so that water flowing from the Petro Processors property drains onto and across plaintiffs' property.
Petro Processors was in the business of industrial waste disposal. It would pick up chemical and other waste material, both liquid and solid, from various industrial plants in the Baton Rouge area, and dispose of it by dumping it in large pits dug for the purpose, or by burying it. Some of this waste material was shown to be toxic or poisonous in nature.
*606 In about June, 1968, three new pits were dug along the edge of the bluff on Petro Processors' property about three hundred feet north of plaintiffs' property line. In December, 1969, material from one or more of these pits began to leak onto plaintiffs' property, allegedly causing damage thereto. Although there is a conflict in the testimony as to the duration of the leakage and the extent thereof, it is clear that the soil of much of the 550 acres of swamp is permeated to some degree with chlorinated hydrocarbons, which are toxic and which are, for all practical purposes, non-biodegradable.
This suit was originally brought by Dave Haas Ewell and his children against Petro Processors, Inc. of Louisiana. Subsequently the remainder of the Ewell family, who are the owners of the other 7/8 interest in the property, were joined as parties plaintiff. The following corporations, whose waste materials were dumped in Petro Processors' pits were joined as parties defendant: Humble Oil & Refining Company (now Exxon Company, U.S.A., a division of Exxon Corporation), the Dow Chemical Company, Ethyl Corporation, Allied Chemical Corporation, Rubicon Chemicals, Inc., Enjay Chemical Company (now Exxon Chemical Company, U.S.A., an operating division of Exxon Chemical Company, a division of Exxon Corporation), Foster Grant Company, Inc., Uniroyal, Inc., Copolymer Chemical Company, and Shell Chemical, Inc.
Prior to the trial, the plaintiffs, other than Dave Haas Ewell, Jr. and his children, entered into a compromise settlement with all defendants, and dismissed their suit.
The case was ultimately tried before a jury, which rendered a verdict for the remaining plaintiffs and against all defendants for $25,000.00 property damage and $5,000.00 for mental anguish. Judgment was signed accordingly and plaintiffs have appealed. All defendants have answered the appeal, so that both the basic questions of liability and quantum are presented.
As to Petro Processors there can be no doubt that it negligently permitted toxic waste materials to leak over onto plaintiffs' property, and it, therefore, is responsible for any damages resulting therefrom. Articles 667, 669 and 2315, Civil Code.
A more difficult question is presented as to the other defendants. Plaintiffs proved, by chemical analysis of a number of soil samples taken at various locations and depths on the property, that chlorinated hydrocarbons were present in quantities from 180 to more than 25,000 parts per million, although, in three spots, no such pollution was detectable. At one point on the Ewell property, near the pits, a small percentage of a brown powder said to contain aromatic hydrocarbons was detected. No other pollutants were found on plaintiffs' property which were attributable to the leakage from the pits.
From the somewhat sketchy evidence on the point, we conclude that Petro Processors stood in the relationship of an independent contractor to its customers. The invoices, purchase orders and letters of authorization in the record indicate that Petro Processors was told what to pick up, and where and sometimes when, but received no instructions as to the method of carrying out the assigned task or the disposal of the waste material. Payment was made as each job was billed to the customer.
Ordinarily, an employer is not liable for offenses of an independent contractor committed in the course of performing his duties under the contract. An important exception to this rule, which has been recognized in this state, is that if the work is inherently or intrinsically dangerous unless proper precautions are taken to avoid injury, the employer cannot avoid liability by letting the work out to an independent contractor. Montgomery v. Gulf Refining Co., 168 La. 73, 121 So. 578 (1929).
Our courts have also concluded that if "the work is such that no precautions will render it completely safe, there can be no shifting of liability. Where an available safe method, which includes the taking of adequate precautions, will render it at least ordinarily safe, and the work is done in an unsafe manner, the employer will be liable if he has expressly or impliedly authorized *607 the particular manner which will render the work unsafe, and not otherwise." Perkowski, The Employer and the Torts of His Independent Contractor in Louisiana, 21 Tul.L.Rev. 619, 627 (1947); Montgomery v. Gulf Refining Co., supra; Rock v. American Const. Co., 120 La. 831, 45 So. 741 (1908); Davie v. Levy, 39 La.Ann. 551, 2 So. 395, 4 Am.St.Rep. 225 (1887).
The record in this case does not support the conclusion that the work done by Petro Processors cannot be done safely. The damages suffered by plaintiffs were due, not to the dumping of toxic substances in the pit, but to the improper construction of one of those pits. We therefore conclude that the customer defendants cannot be held liable unless it is shown that they were aware of the leakage at the pits and continued to dump hazardous material at that site.
Some of the defendants were not proven to have dumped any waste containing the substances that allegedly polluted plaintiffs' property. Shell Chemical disposed of by-products of the manufacture of detergent products. The chemical composition of these by-products was not proven. Rubicon dumped only waste oil. It is not shown what the chemical composition of the waste might have been.
Foster Grant, between November 6, 1968, and June 1, 1971, dumped over 22 million pounds of styrene tar residue in these pits. Plaintiffs' expert did not know the chemical content of styrene tar. He testified that styrene is an aromatic hydrocarbon, which is toxic but also more readily biodegradable than the chlorinated hydrocarbons. Since aromatic hydrocarbons of unknown content were found at only one spot on plaintiffs' property, and in unknown quantity, we do not believe that it has been proven that plaintiffs' property was polluted by chemicals dumped by Foster Grant.
With respect to Enjay, the evidence shows that the following work was done by Petro: "pump up acid lead"; "pump out sewer ditch"; "clean Drums D-8 D-10B and D-10C at Crude Enthanol"; skim No. 1 and No. 2 Coolers at Acid Plant"; "pump out 1721 tank"; "pump out Tank # 1745 at the Acid Plant"; "pump out holes at Ave. J and 29th, Crude 90% acid line"; "empty drum AD416 (Cobalt Settling Drum) at Aldox United"; "pump out catalyst drum # 3951 at Oxo Unit"; "pump out 98% acid line leak"; "pump out K box and dispose of contents"; "pump out cobalt sump pit at Catalyst Plant"; "remove one (1) load of contaminated Ethyl Mercaptan from CD-2 at OLA-1)"; "pump ½ load of viscous hydrocarbon out of D-321-C at Resin United"; "clean Tank # 522 containing approximately 7000 barrels leaded slop." None of these jobs indicate that the materials were to be disposed of by Petro Processors, and none of the materials are identified as chlorinated hydrocarbons.
Enjay also authorized that the following materials be dumped at the pits: slop acids, dry dessicants, 40 17E "Poison" drums, waste polymer and catalyst, waste stearate, 125 cubic yards of lead spill, 300 loads of leaded slop bottoms, silica gel and alumina, 19 55-gallon drums of Buton, five 55-gallon drums of DILA T-1 bottoms (40% isoprene), 12 5-gallon cans of isoprene, 570 cubic yards of alumina, waste chemicals, "14,000 gallons of alcohol used in cleaning T-1 caustic scrubber", waste polymer and cement, 20 cubic yards of Aromatic Coke, and 55 cubic yards of spent chemical solution. Once again, none of the foregoing materials are shown to contain chlorinated hydrocarbons.
The same is true as to Humble Oil. The only evidence in the record as to the materials dumped at the pit by Humble is a series of letters of authorization, which authorizes the dumping of the following materials: asphalt, spent sulphuric acid and water, sulphuric acid, "2000 cubic yards of earth which may contain traces of Phenol and lead", kerosene, diesel oil, hydrocracker feed, leaded slop, jet fuel slop, "material from our Phenol Retention Basin," clarified oil and catalyst bottoms, and phenolic caustic. Petro Processors was also authorized to "pump out inside of Caustic Concentrator", "pump out drums, towers, and inside firewall at East Phenol Turnaround"; "pump out Desalters at No. 10 Pipe Still"; and "clean one (1) desalter at No. 8 Pipe Still."
*608 Copolymer, in answering interrogatories propounded to it, stated that it had dumped by-products of the manufacture of styrene butadiene synthetic rubber at the pits. Trip tickets introduced into evidence showed that the materials included "1-12-RD", scrap rubber, latex, and waste rubber. On one occasion Petro Processors pumped out a "stop oil skimming basin." No showing was made that any of the material dumped contained chlorinated hydrocarbons. If the use of a styrene compound indicates the presence of aromatic hydrocarbons, there is still not sufficient evidence to show that plaintiffs' property was polluted by those chemicals.
Allied was dumping from three different sites, and, from two of those, there is no evidence of any chlorinated hydrocarbons having been dumped at the pits. The Plastics Division admitted dumping 60,000 pounds of chlorinated polyethylene between January 27 and 29, 1970. It is not shown in which pit this material was dumped, or if it was liquid or solid.
Dow Chemical was dumping "chemical wastes of a tarry polymeric nature" at the pits between June 15, 1969, and May 5,
1970. Invoices further identify some of the material as "CPE", the meaning of which is not explained in the record. Representatives of Dow visited the pits in the fall of 1969, the spring of 1970 and the winter of 1970-71.
Ethyl used the services of Petro Processors from June, 1967, through May, 1971, for disposing of the by-product of chlorinated hydrocarbon wastes, principally hexachlorobutadiene from the manufacture of perchloroethylene and trichloroethylene. Several Ethyl employees visited the site, but an unspecified times.
Uniroyal stated that it disposed of tank cleanings containing butadiene, Acrylonitrile and Latex; recovered styrene; caustic soda wash from scrubbing TBC from butadiene; and latex slurry. After June 1, 1971, only dry waste of ABS plastic and a small amount of nitrile rubber was dumped. None of the above compounds are shown to contain chlorinated hydrocarbons. Some Uniroyal personnel made periodic visits to the pits.
From the foregoing, we find that there is no evidence to sustain a finding by the jury that chlorinated hydrocarbons were dumped in the pits by Uniroyal, Dow, Copolymer, Humble, Enjay, Foster Grant, Shell Chemical and Rubicon.
Both Allied and Ethyl are shown to have dumped chlorinated hydrocarbons in the pits, although Allied only did so over a three-day period in 1970. It is not shown when Allied became aware that the pits were leaking, and the record is clear that no chlorinated hydrocarbons were dumped by it after January 29, 1970.
Ethyl is the only customer defendant which is shown to have dumped the pollutant in question from before the pits were found to be leaking until well after this suit was filed. Since it admitted that several of its employees visited the pits, knowledge of the condition thereof can certainly be attributed to it. We therefore find that Ethyl is liable solidarily with Petro Processors for the damages done to plaintiffs' property.
The major question presented by this case is one of the measure of damages. Plaintiffs argue that they are entitled to reparation of the damage done to their property by the chemical spill which polluted it. They sued for over $170,000,000.00, which is alleged to be the cost of removing the polluted soil from their property and replacing it with good soil. The trial judge held that plaintiffs could not recover more than the value of the property damaged, and so instructed the jury. In awarding the sum of $25,000.00 to plaintiffs the jury gave very nearly the full value of an undivided one-eighth of the 550 acres which lies below the 35-foot contour line.
There is no hard and fast rule in Louisiana as to the measure of damages in cases such as this. In some cases involving immovable property our courts have used the cost of restoration as the measure. Wilson v. Scurlock Oil Co., 126 So.2d 429 (La.App. 2nd Cir. 1960); Melancon v. Oilfield Lubricant *609 Services, Inc., 292 So.2d 908 (La.App. 1st Cir. 1974). In other cases, the difference between the value of the property before and after the damage has been the measure. Womack v. Travelers Ins. Co., 258 So.2d 562 (La.App. 1st Cir. 1972); Curole v. Acosta, 303 So.2d 530 (La.App. 1st Cir. 1974). In one case, a combination of the two methods was used. Daspit v. State, Department of Highways, 325 So.2d 368 (La.App. 3rd Cir. 1975).
Plaintiffs point out the very real social problem which is caused by industrial pollution of all kinds, and argue, quite persuasively, that money alone cannot cure the damage done in such cases, and that those liable should be held responsible for the restoration of the environment to its original condition.
We think that the proper measure of damages must be determined from the circumstances of each case, considering such factors as the extent of the damage; the use to which the property may be put; extent of economic loss, both as to value and income; and the cost of and practicability of restoration.
The subject property is swamp, subject to periodic overflow from the Mississippi River and from Baton Rouge Bayou. Prior to being polluted, it was used seasonally for grazing of cattle, and, non-commercially, for hunting and fishing. Its only other commercial use was for the growing of timber. Its value was set at $375.00 per acre, or slightly over $200,000.00 for the 550 acres affected, by the only expert witness who testified as to that point. The restoration of the property, according to plaintiffs' witness, would take about seven years, involve the use of 100 trucks running continuously during that time, and would cost 170 million dollars. Only these plaintiffs among the owners of the property, were interested in seeking such relief.
Under those circumstances, we are of the opinion that the proper measure of damages is the diminution in value of the affected property. The testimony as to the effect of the pollution on the property is in hopeless conflict. Plaintiffs' witnesses tell of a dead and useless tract of land, unable to support life of any sort, animal or vegetable. Defendants' witnesses describe a living swamp, teeming with fish and wildlife, with a healthy and increasing growth of timber. The dying trees in the swamp are said to be the result of the pollution by plaintiffs' witnesses and of increased flooding and siltation by those of defendant.
The jury obviously accepted the testimony of plaintiffs' witnesses, since they awarded the full value of their interest in the property to plaintiffs. We cannot say that this finding is manifestly erroneous, since there is evidence in the record on which such a finding could reasonably be based. The same is true as to the award of $5,000.00 for mental anguish.
Plaintiffs have complained of a number of evidentiary rulings made by the trial judge, and as to his failure to instruct the jury in certain respects. In view of our finding that the jury made the maximum award permissible under the circumstances of this case, we see no point in detailing or commenting on these rulings.
The judgment appealed from is reversed insofar as it grants judgment against Humble Oil and Refining Company (now Exxon Company, U.S.A.), The Dow Chemical Company, Allied Chemical Corporation, Rubicon Chemicals, Inc., Enjay Chemical Company (now Exxon Chemical Company, U.S.A.), Foster Grant Company, Inc., Uniroyal, Inc., Copolymer Chemical Company and Shell Chemical, Inc., and there will be judgment dismissing plaintiffs' suit as to those defendants, at plaintiffs' cost. In all other respects the judgment is affirmed at the cost of those defendants cast in judgment.
REVERSED IN PART, AFFIRMED IN PART AND RENDERED.