462 So.2d 274 (1984)
Carroll MATHERNE
v.
TERREBONNE PARISH POLICE JURY.
No. CA 84 0306.
Court of Appeal of Louisiana, First Circuit.
December 28, 1984.
Writs Denied February 15, 1985.
*275 William Stark, Grady C. Weeks, Houma, for plaintiff and appellee Carroll Matherne.
Joseph G. Kopfler, Jerry L. Hermann, Houma, William J. Doran, Jr., Baton Rouge, for defendant and appellant Terrebonne Parish Police Jury.
R. Gordon Kean, Jr., Baton Rouge, for Louisiana Mun. Assn.
Before COLE, CARTER and LANIER, JJ.
*276 COLE, Judge.
The principal issue here presented is the proper measure of damages for the use of land pursuant to La.R.S. 38:113, which provides for the control of public drainage channels and the preservation of their efficiency. In this case the defendant parish governing authority was made to compensate the plaintiff landowner for the use of his land in an amount in excess of its actual value. Also presented for our review is the correctness of awards for other damages alleged to have occurred as a result of the land usage.
Flooding and drainage problems in the northern and western reaches of Terrebonne Parish caused the Terrebonne Parish Police Jury (Police Jury) in the early 1980's to develop a project for the dredging and cleanout of Ouiski Bayou and Little Bayou Black from Savane Road southward. The Police Jury, by resolution, on October 27, 1982, designated Ouiski Bayou and Little Bayou Black as public drainage channels. On November 5, 1982, by letter, the Office of Public Works for the Department of Transportation and Development accepted these bayous as public drainage channels.
In order to facilitate this project, the Police Jury attempted to secure right-of-way agreements from the landowners adjacent to the bayous. Accommodations were obtained from landowners on the west side of the bayous. The land on the east side of the bayous is owned by plaintiff, Mr. Carroll Matherne. Attempts were made to contact Mr. Matherne concerning negotiations for a right-of-way, but the attempts never came to fruition.
The Police Jury, after serious deliberations, decided to proceed with the required dredging from the east side of the bayous even though no accommodation had been obtained from Mr. Matherne. As authority for this action, the Police Jury invoked a servitude of 100 feet along the drainage channel pursuant to La.R.S. 38:113. The contractor for the Police Jury, Ronald Adams, proceeded to dredge the channel depositing what amounted to 50,000-60,000 cubic yards of spoil along the 100 foot servitude on Mr. Matherne's farm. During this process, over 1000 trees were uprooted from the 100 foot strip of land bordering the bayou.
Initially, Mr. Matherne sought to enjoin these operations on his property, attacking the constitutionality of La.R.S. 38:113 as constituting a taking of his property without due process of law in violation of Article I, Section 4 of the Louisiana Constitution of 1974. The Police Jury reconvened, seeking an injunction in order that it could proceed with its project operations. The district court rendered judgment denying Matherne's injunction and granting the Police Jury an injunction "restraining, enjoining and prohibiting him [Matherne], ... from preventing reconvenor [Police Jury],... from exercising a one hundred (100') foot servitude of use on either side of Little Bayou Black and Ouiski Bayou in Terrebonne Parish, Louisiana, for the purpose of maintenance work on said public drainage channels pursuant to ... Louisiana Revised Statute 38:113." (Emphasis added). This judgment was not appealed and is now final.
Mr. Matherne then filed suit against the Police Jury seeking compensation for these activities. His petition also alleged the spoil caused 22 thoroughbred mares to slip their foals and sought damages for this aspect as well.[1]Lemire v. New Orleans Public Service Inc. and Sewerage and Water Board of New Orleans, 458 So.2d 1308 (La.1984).
The district court after a lengthy trial granted judgment in favor of Mr. Matherne and against the Terrebonne Parish Police Jury. The judgment contained the following awards:

 Lost use of property...........$ 350,000.00
 Replacement cost for trees.....$ 535,570.00
 Cost to remove spoil...........$ 725,000.00
 Amount already paid to remove
 spoil..........................$ 75,000.00
 Loss of foals..................$ 880,000.00
 Cost of pump...................$ 1,439.66
 Expert fees....................$ 1,000.00
 _____________
 TOTAL..........................$2,568,009.66

*277 Defendant appeals from this judgment as punitive in nature and not sustained by the evidence presented at trial. We agree and find it necessary to reverse in part, amend and, as amended, affirm the judgment of the district court.

I.
La.R.S. 38:113 provides:
"The various levee and drainage districts shall have control over all public drainage channels within the limits of their districts and for a space of one hundred feet on each side of the channel, selected by the district and recommended and approved by the Department of Public Works, whether the drainage channels have been improved by the levee or drainage district, or have been adopted without improvement as necessary parts of or extensions to improved drainage channels, and may adopt rules and regulations for preserving the efficiency of the drainage channels."
This provision was properly invoked by the Police Jury because it was determined the process of dredging the bayous would promote the efficiency of the drainage channel. However, the Louisiana Supreme Court has determined, in a related case, "[La.R.S. 38:113] does not authorize the taking or damaging of private property without just compensation or without due process of law...." Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314, 317 (La.1981), cert. denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed. 845 (1982).
In Matherne, the court indicates the use of 100 feet on each side of the channel, provided for by La.R.S. 38:113, is for "ordinary maintenance." Although the trial record shows the dredging must be performed only once every fifty years, the duration and extent of the land use in this instance demonstrates the actions of the defendant were not ordinary maintenance. Exerting control over the 100 foot strip adjacent to the drainage channel for six months by depositing 50,000 cubic yards of spoil and uprooting trees constitutes a taking and damage for which compensation is due.
Due process of law guarantees a property owner a judicial review of whether the government acted arbitrarily, capriciously or in bad faith in determining the taking or damage of property was necessary. State, Etc. v. Jeanerette Lumber & Shingle, 350 So.2d 847 (La.1977), on rehearing. The trial record is replete with references to right-of-way agreements on the west bank of the bayous. According to plaintiff, because these right-of-way agreements were not exercised, the defendant's determination to conduct dredging operations from the east bank under the authority of R.S. 38:113 must have been unnecessary and, therefore, in bad faith.
However, plaintiff has a heavy burden of proof in this regard. He must show the defendant's action "was `without adequate determining principle or was unreasoned.'" State, Etc. v. Jeanerette Lumber & Shingle, 350 So.2d at 863. As indicated in Jeanerette Lumber & Shingle, the existence of an alternative does not cause the chosen method to become arbitrary or in bad faith. The contractor, Ronald Adams, testified as follows:
"... I personally, along with the engineer and a representative of the Parish, walked every bit of the project, looked at the right-of-way agreements and basically made a decision as to which trees remained, why we had to stay on one side and get the pluses and minuses. We didn't just start the project and go on one side or the other one because we felt like we wanted to go right or left. We walked the project, we looked at all the obstacles. We tried to make a decision based on all the information."
Further testimony reveals the west bank was wired with high powered overhead electrical lines; in close proximity to a high speed highway; and developed with residential homes and landscaping. The east bank was an undeveloped pastureland. We find the plaintiff has not sustained his burden *278 of proof in showing arbitrary, capricious or bad faith conduct on the part of the defendant.

II.
Consideration must now be given to determining what constitutes just compensation in this matter. In Matherne, the court states the lawful method for the taking of property or prevention of its enjoyment in order to promote the overall efficiency of a drainage system is through an expropriation. 405 So.2d 314, 317. An expropriation did not occur in the present case. The taking and damaging of property occurred as a result of the defendant exceeding the scope of authority granted it by La.R.S. 38:113. Therefore, the issue is raised as to the proper measure of damages stemming from the defendant's excess.
The district court found the proper basis for damages caused by an exercise of authority granted by La.R.S. 38:118 to be La.Civ.Code art. 2315. The measurement of recovery for property damages under La.Civ.Code art. 2315 was found by the district court to be the cost of restoration and the value of the lost use of the property, citing Coleman v. Victor, 326 So.2d 344 (La.1976). We find this measure to be in error and the reliance on Coleman misplaced.
In Reymond v. State, Department of Highways, 255 La. 425, 433, 231 So.2d 375, 383 (1970), the Louisiana Supreme Court states, "Since a taking or damaging of property may in fact occur without expropriation proceedings by a public body through oversight or lack of foresight, there must be some proceeding whereby an owner may seek redress when his property is damaged or taken without the proper exercise of eminent domain. Such an action is often referred to as `inverse condemnation'..." Reymond involved structural damage to a residence caused by piledriving activity and the court held the proper measure of damages whether in condemnation or inverse condemnation is the difference between market value of the property before and after the damaging.
Further, in Gray v. State, Department of Highways, 250 La. 1045, 202 So.2d 24 (1967), the removal of 120,000 cubic yards of dirt took place from an unexpropriated portion of land. This dirt was used in the construction of a highway even though a borrow pit had been expropriated under the law, but left unused on another portion of the land. An action ex delicto was filed by many landowners for damages from an alleged trespass. The Louisiana Supreme Court responded, in part, by stating:
"... the constitutional guarantee of adequate compensation to the owner vouchsafes payment of the price to which a willing seller and purchaser would agree in the case of a voluntary sale and this is exactly the measure of compensation market value of the property and severance damagesto be applied in condemnation proceedings. And it makes no difference in determining the amount to be awarded that the property was appropriated and not formally expropriated. Albeit in appropriation cases the condemning authority does not obey the mandate of the law that the compensation be paid before the taking, the non-compliance of this condition precedent to the condemnation does not subject the appropriator to a penalty, for when the owner recovers just compensation, he recovers all the law gives him. To hold otherwise would be to inflict punitive damages upon the condemnor which is not permissible under our civil law system." Gray, 202 So.2d at 30.
The cases of Reymond and Gray illustrate the proper measure of damages due in this instance to the plaintiff. Even under tort theory, which the district court sought to apply, recovery is to be calculated in a similar manner. In Coleman, a case involving damage to an automobile, what the Louisiana Supreme Court held was the plaintiff could only recover the amount necessary to repair and restore the vehicle and not the greater amount of market value at the time of accident minus *279 salvage value which the plaintiff sought. The court did note market value at the time of accident would be the maximum limit to the plaintiff's recovery. We do not, therefore, find the holding in Coleman contrary necessarily to the theory of Reymond and Gray. More analogous, however, are those cases involving the tortious conversion of property. It has been held the measure of damages for tortious conversion is the value of the property wrongfully appropriated or detained. Importsales, Inc. v. Lindeman, 231 La. 663, 92 So.2d 574 (1957). See also, Gurst v. City of Natchitoches, 428 So.2d 502 (La.App. 3d Cir.1983). See also, Ewell v. Petro Processors of Louisiana, Inc., 364 So.2d 604 (La.App. 1st Cir.1978), writ denied, 366 So.2d 575 (La.1979), wherein the court, treating concepts very similar to those here involved (albeit a suit against non-public entities by landowners), found the proper measure of damages to be the diminution in value of the affected property. In Ewell, full value was awarded when it was determined the affected property was rendered useless.
Only in the most egregious cases of willful and wanton disregard for the interest of the property owners will trial court discretion exist to apply a different measure of damages. See, Pearce v. L.J. Earnest, Inc., 411 So.2d 1276 (La.App. 3d Cir.1982), writ denied, 414 So.2d 377 (La. 1982); Daniel v. Dept. of Transp. & Development, 396 So.2d 967 (La.App. 1st Cir. 1981), writ denied, 400 So.2d 1385 (La. 1981). Such is not the case here. The dredging of the drainage channel satisfies the public purpose requirement of La. Const. art. I § 4. The defendant is a public body with power of expropriation according to La.R.S. 19:1 et seq. The defendant proceeded under authority of La.R.S. 38:113 and a court order in initiating and conducting the operations. To apply any other measure of damages under these circumstances would be punitive in nature as stated by the court in Gray. Further, efforts were made to preserve the more valuable trees on the 100 foot strip. These efforts were also noted by the district court during the injunction hearing. All operations were limited within the 100 foot delineation. We therefore hold the proper measure of damages in the present instance is the lesser of either the market value of the property and severance damages minus any residual value or the cost of restoration to the property's condition at the time the taking was initiated. The proper measure can not be both as was found by the district court.
In applying the above formula, the valuations discerned by the district court should be given great weight. As well, the evidence presented by the trial record should be considered. Initially, the extent of the property involved should be determined.
The areas of land to be examined break down into three discrete segments. The first area, tract 1, is property situated adjacent to Ouiski Bayou. It begins at the Southern Pacific Railroad and extends eastward and northward for more than one-half mile to the northern boundary of Mr. Matherne's property. This 100 foot strip of land contains 6.3 acres. (A portion is situated behind the property of one Hunt Downer.)
The second area, tract 2, is property situated adjacent to Little Bayou Black and the small portion of Ouiski Bayou west of the railroad tracks. It begins at the southern boundary of Mr. Matherne's property and extends northward generally for more than two-thirds of a mile to the point where tract 1 commences. This 100 foot strip of land contains 8.45 acres.
It is disputed whether compensation must be provided for a third area, tract 3. Tract 3 is the property situated between the Southern Pacific Railroad and Little Bayou Black which is not included in the 100 foot strip adjacent to the bayou. Tract 3 contains 7.25 acres according to testimony given by Mr. Craig Stanga, plaintiff's expert real estate appraiser. Mr. Stanga testified tract 3 is removed from commerce because without the adjoining acreage in tract 2 it is too narrow for development and could only be used as pastureland. Defendant *280 contends no compensation should be provided for tract 3.
Compensation for the lost use of tract 3 would constitute severance damages, which, under the rationale in Gray, are a recoverable element. However, Mr. Stanga, in reference to tract 3 being removed from commerce, testified:
Q. "Well, you mean some of that area in there is not suitable for residential? It's too small, isn't it?
A. "Not before the servitude, no.
Q. "I'm not talking about the servitude. I'm talking about from the bayou to the railroad track. You said it's a hundred and twenty-five feet there?
A. "In depth?
Q. "Yeah.
A. "At places.
Q. "Well, is that too small for residential lots?
A. "Is one hundred and twenty-five feet in depth too small? No.
Q. "Okay."
Mr. Stanga's testimony indicates severance damages should only arise when the area between Little Bayou Black and the Southern Pacific Railroad is less than 225 feet in depth. This accounts for both the 100 foot strip and the 125 feet necessary to develop residential lots. Applying Mr. Stanga's conclusions, we have made our own calculations from the trial record, using particularly a survey map exhibit labeled "Matherne-11." Thusly, we find the area to contain only 3 acres, not 7.25 acres as Stanga indicated.[2] We therefore use this lesser acreage for valuation purposes as regards tract 3.
Along with testimony by Mr. Stanga, Mr. Logan Babin qualified for the defendant as an expert real estate appraiser. Opinions were provided by both men as to the value of the appropriated acreage. The district court, seeking to do equity, took an approximate average of these opinions as damages for the lost use of Mr. Matherne's land. However, a more exact reckoning of the acreage value must be made.
Mr. Stanga testified as to the value per acre of 22 acres. His acreage total was a composite figure of tract 1, tract 2 and his rendition of tract 3. Mr. Babin gave distinct values per acre for tract 1 and tract 2 with a great disparity between the value per acre of each tract: $6,500 compared to $24,500, respectively. Mr. Stanga's value per acre figure was approximately midway between these valuations, at $16,600 for each of the 22 acres. This indicates that Mr. Stanga's value per acre is correct for neither tract 1 nor tract 2. Even though it may be a true composite, the valuation is of no use to this court in determining compensation because exactitude is required. We, therefore, use the valuations of Mr. Babin and since tract 3 is in essence the same property as tract 2 we apply a like valuation to it. Summarizing, tract 1 is valued at $6,500 per acre and tracts 2 and 3 are valued at $24,500 per acre.
A valuation must also be given to the residual worth of the properties. Mr. Stanga provided a figure of $1,200 per acre as pastureland; Mr. Babin provided a figure of $3,000 for the same use. In considering the probative value of each figure, this court gives credence to the original purchase price of the land in 1977. Mr. Matherne paid $2,000,000 for 785 acres of pastureland. This reduces to $2,548 per acre. Land is generally not depreciative in nature, therefore the $3,000 per acre figure appears most reasonable as residual value based upon use as pastureland.
However, the residual value can only be noticed as to tract 3. Tract 1 and tract 2 are inundated by a quagmire-like spoil. Testimony establishes the tracts are of no use to Mr. Matherne in such a condition. Although it is obvious the tracts have some residual value, no evidence to rebut plaintiff's contention of no residual value has been provided by the defendant. We, therefore, apply no residual value to tract 1 or tract 2. Tract 3, not being covered by the spoil, retains a residual value of $3,000 per acre as pastureland.
*281 It must be reiterated at this time La.R.S. 38:113 does not by its terms constitute a taking. See Matherne, 405 So.2d at 317. Damages in this case stem from the presence of the spoil on the land and the concomitant loss of use. The formula must still be applied to find if the market value of the land minus residual value is less than the cost of spoil removal and tree valuation.
The following calculations shall determine the proper compensation for Mr. Matherne's lost use of his land due to the Police Jury's operations:

Tract 1
 $ 6,500 per acre
 ×6.3 acres
 ________
 40,950
 −0 residual value
 ________
 $ 40,950
Tract 2
 $ 24,500 per acre
 ×8.45 acres
 ________
 $207,025
 −0 residual value
 ________
 $207,025
 Tract 3
 _______
 $ 24,500 per acre
 ×3 acres
 ________
 73,500
 −9,000 residual value ($3,000 per acre multiplied
 ________ by 3 acres)
 $ 64,500
Tract 1 $ 40,950
Tract 2 $207,025
Tract 3 $ 64,500
 ________
Total $312,475 (Value of lost use of land)

Fifty to sixty thousand cubic yards of spoil were deposited upon the 100 foot strip. After testing, the spoil was found to possess a 30% water content. It was described as being like quicksand. An attempt was made by Mr. Clark Porche, the plaintiff's nephew, to remove the spoil. Mr. Porche was paid $75,000 for moving 5,000 cubic yards of the spoil. A bid was made by Mr. Larry Hebert to remove the spoil for $14.50 a cubic yard. Based upon this evidence the district court found it would cost $725,000 to remove the remaining spoil. In addition to the $725,000, the district court awarded the $75,000 paid to Mr. Porche. Although we agree with the district court's findings of fact here, we find both awards to be in error.
The cost of restoration must be compared with the market value of the land. The lesser figure is the only award which can be made. Since the market value with severance damages minus the residual value amounted to $312,475, it is the lesser figure and the upper limit of an award resulting from damage to the plaintiff's land.
The $75,000 paid to Mr. Porche was done at the initiative of the plaintiff. The results of this initiative inured to the plaintiff's benefit. The area of land from which the spoil was removed will regain some prior worth. Additionally, plaintiff had the spoil deposited alongside one of his barns on the farm. However, no award above the lost use of land can be made because undesirable consequences would follow. The plaintiff would have the capability to determine his own measure of damages. A cumulation of damages would occur in contradiction to the rationale of Reymond and Gray. Therefore, no recovery for the $75,000 paid by plaintiff to Mr. Porche can be allowed by this court.
An award was made by the district court for the replacement of 1,093 trees. This award amounted to $535,570. Although this court doubts the propriety of such an award for tree loss, whether the award has a proper basis is an issue which this court need not discuss. The replacement cost of the trees must be added to the cost to remove the spoil ($725,000) to obtain a total restoration cost for the land. The cost to remove the spoil is already established as greater than the lost use value of the land. Therefore, even if the tree award were a single dollar it would not change the amount of damages because the lesser figure of $312,475 must prevail. The award of spoil removal costs and tree replacement costs by the district court are reversed accordingly.

III.
The plaintiff contends the dredging operations and spoil deposit were responsible *282 for the miscarriages of 22 thoroughbred mares. The district court perceived the testimony of the plaintiff's veterinary expert to be uncontroverted. The expert indicated the operations of defendant were the cause of the miscarriages. Therefore, an award of $40,000 per unborn foal was presented totaling $880,000. We disagree with the judgment of the district court on this point and therefore reverse.
An act will be deemed a cause-in-fact of an accident only when it is concluded to be a substantial factor in bringing about the harm. LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978). Dr. Salvatore Lococo, plaintiff's veterinary expert, testified as to the cause of the miscarriages.
"Q. Why, in your opinion, your expert opinion, did these six foals slipthat you saw when you were down here?
A. I would say it's probably from them fighting over food, getting too closebecause mares are very protective of whatever foals that are there, or eating and so forththey're probably fighting and probably from some malnutrition associated with that, not being able to get to the food when they should you know, and just general fighting and biting, and you get low-grade infections from various bites and lacerations on them. The horses were in fairly bad shape when I saw them.
Q. And in your opinion, this was because they were penned up in this small area?
A. Too small of an area."
Dr. Lococo testified further:
"Q. And when you got there, had any of the horses that you had checked in Kentucky slipped their foals?
A. He had lost approximately six foals that we could determine and they were in various degrees of development, and the other horses were in bad shape I guess because of the close proximity of the horses and feeding them in that area. You usually isolate them. He had more horses jammed in there than I thought. You usually isolate in-foal mares, and barren mares, which are mares that are not in foal, yearlings, weanlingsyou usually isolate these."
Therefore, the direct cause-in-fact for the miscarriages was the overcrowding due to placement in a small pen (30 acres) and the failure to separate the in-foal mares from the barren mares which led to internecine warfare among the mares.
However, it may be considered in determining whether an actor's negligence is a substantial factor in bringing about the harm "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm...." Restatement of Torts, 2d, Section 433(B) (1965); LeJeune, supra. Therefore, if the dredging operations and spoil deposit were a force in requiring the pregnant mares to be overcrowded, causation may be found.
The plaintiff claimed he isolated the horses in the thirty acre pen on Wayne Avenue relying upon the warning of Dr. Lococo. Dr. Lococo corroborated the warning to isolate the horses from the spoil was indeed communicated to the plaintiff. Based upon this communication the district court found causation between the dredging operations and the miscarriages.
However, the plaintiff, Mr. Matherne, contradicts his own testimony to the effect the horses were isolated because of this communication. The horses were isolated in the Wayne Avenue pen prior to the communication by Dr. Lococo and prior to the start of the dredging operations. The plaintiff testified:
"Q. When you brought your horses down from Kentucky before the Police Jury went on the property, you had them penned up on Wayne Avenue, didn't you?
A. Well, the end of Wayne Avenue.
Q. Yes, sir.
A. That is correct.
Q. You had them penned up in one paddock right there, didn't you?
A. That is correct."
*283 The plaintiff in further testimony indicated the reason for this penning of the horses:
"Q. So I understand, when the Police Jury went on your property, was it November of '82 and you had a court order to get them off your property, right?
A. That is correct.
Q. Okay. Now at that time, your horses were still up there on Wayne Avenue in that paddock?
A. I believe they were. You see, I sold the big farm I had in Kentucky. I had two farms in Kentucky and I sold them, and when I sold the farm I had to bring the horses down here. I couldn't go back to Kentucky with them, I had no farm and Dr. Lococo claimed he couldn't find a place to put them in the Wintertime (sic)."
In addition to the above, there appears to be other factors which led to the necessity of penning the horses in the small Wayne Avenue pen. A large paddock of some 600 acres was being fenced in by plaintiff but was not completed when the transfer of the horses from Kentucky occurred. Left loose, seven horses were hit by cars on Hollywood Road. The horses also risked injury from the trains which traversed the plaintiff's property. The plaintiff had filled all his available barnspace and had not yet completed a new barn. Therefore, substantial reasons existed for the plaintiff to pen up the horses, even the pregnant ones, together in the Wayne Avenue pen. The plaintiff testified he had placed 13 more valuable pregnant mares in separate barn stalls. This indicates plaintiff possessed the knowledge the in-foal mares should be separated from the rest of the herd, particularly the barren mares.
This court is not satisfied that causation would have been present even if the plaintiff relied on Dr. Lococo's warning to isolate the horses from the spoil. Dr. Lococo testified the need to isolate the horses from the spoil arose because he assumed hydrocarbons were present in the spoil based upon a previous experience several years prior. The doctor also stated bacteria could be present in the spoil.
No tests were performed on the spoil to determine if it was dangerous to the horses. Also, the horses were exposed to other areas on the farm where the bacteria complained of was present. Testimony from others indicates some spoil was spread on various places throughout the farm and plans existed for the placement of even greater amounts. We infer the plaintiff himself did not believe the spoil to be contaminated.
Further, the plaintiff failed to avoid his damages although he had several options by which to do so. The work on his large fenced area stopped because of an unavailability of pipe. However, plaintiff could have closed in a small area of this fencing solely for the use of his in-foal mares. The plaintiff made only abbreviated attempts to obtain alternative accommodations for his 22 valuable charges. The evidence indicates a failure to pursue possible accommodations. We find, therefore, the plaintiff has failed to sustain his burden of proving the dredging operations and spoil deposit constituted a force or series of forces in requiring the pregnant mares to be overcrowded which, in turn, caused them to slip their foals. As well, we reverse the district court's taxing as cost, against defendant, $500 as expert fees to Dr. Lococo because La.R.S. 13:3666 requires these costs to be taxed against the party cast in judgment.

DECREE
We reverse the district court as to the awards for spoil removal, tree replacement, loss of foals and expert fees to the veterinarian. We amend the award for the lost use of property by reducing same to the sum of $312,475.00. We affirm all other items awarded by the district court. Our review of this matter results in a net award to plaintiff of $314,414.66. Costs of this appeal are to be divided equally between the parties.
REVERSED IN PART; AMENDED AND, AS AMENDED, AFFIRMED.
*284 LANIER, J., concurs and assigns reasons.
CARTER, J., concurs for reasons assigned by LANIER, J.
LANIER, Judge, concurring, with whom CARTER, Judge, joins.
We respectfully concur in the result.
The Terrebonne Parish Police Jury (Jury) designated Ouiski Bayou and Little Bayou Black as public drainage channels on October 27, 1982. This designation was accepted by the Office of Public Works of the Department of Transportation and Development of Louisiana (DOTD) on November 5, 1982. On November 24, 1982, Carroll Matherne filed a suit against the Jury seeking to enjoin it "from cutting trees on his property and from causing dredged spoil to be deposited on his property." Matherne contended, in part, that the action of the Jury constituted a taking of his property without due process as prohibited by La. Const. of 1974, art. I, § 4.
By a letter pre-dating the filing of suit, but received by Matherne after he filed suit, the Jury advised him of its action of October 27, 1982, DOTD's action of November 5, 1982, transmitted copies of the project map and La.R.S. 38:113 and informed him it would pay "for any actual damages done to the property". The Jury answered Matherne's petition and reconvened to enjoin Matherne from preventing the Jury "from utilizing the one hundred foot (100') servitude on either side of Ouiski Bayou and Little Bayou Black from (sic) maintaining those public drainage channels." The Jury conceded it had gone on Matherne's property and cut some trees and, if successful in this litigation, would continue to cut trees and would dredge the two bayous where they traversed Matherne's property. The Jury contended it was authorized to do this work by La.R.S. 38:113.
A hearing was held on these claims on November 30, 1982, written reasons for judgment were issued on December 2, 1982, and a judgment was rendered on December 3, 1982. The district court found this case involved "the utilization of a statutory servitude as opposed to expropriation or the taking of any property in any form." The court quoted from Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314 (La.1981) and stated:
This is not a situation where there will be a taking or damaging of private property without just compensation or without due process of law. The Jury in its letter of transmittal to Matherne (Exhibit P-5) in addition to furnishing him with the requisite information relative to the fact that Ouiski Bayou and Little Bayou Black were going to be maintained in accordance with the Statute, also informed Matherne that he would in fact be compensated for whatever damages he might suffer in the course of said maintenance work.
The court rejected Matherne's contention that the Jury's actions were unconstitutional under La.Const. of 1974, art. I, § 4 with the following language:
As previously observed in this instance there is no taking of property but rather the use of property under the terms of the servitude created by Legislative authority. There will obviously be damage to Matherne's property but there will equally as obviously be compensation paid to him for that damage.
Thus the Court finds that in this instance rather than a taking of property there is a utilization of the servitude with a concurrent damage occurring during the course of the utilization of that servitude.
The court then reached the following conclusions:
The Court must therefore conclude that there is no irreparable injury being suffered or likely to be suffered by Matherne, that R.S. 38:113 provides the Jury with full authority to do what it has done and what it proposes to do, that R.S. 38:113 applies in all respects to Matherne's property, and that Matherne's remedy is to seek compensation under Civil Code Article 2315 for whatever *285 damage he may suffer. (Emphasis added).
The court rendered judgment rejecting Matherne's request for an injunction to stop the Jury "from cutting trees on his property and causing spoil to be deposited" thereon, and granted an injunction in favor of the Jury prohibiting Matherne from preventing the Jury "from exercising a one hundred (100') foot servitude of use on either side of Little Bayou Black and Ouiski Bayou in Terrebonne Parish, Louisiana, for the purpose of maintenance work on said public drainage channels pursuant to State Project No. 503-55-06 and Louisiana Revised Statute 38:113." (Emphasis added). This judgment was not appealed and is final.
It appears the interpretation given to La.R.S. 38:113 by the district court in the injunction proceedings is similar to that given it by this court in Terrebonne Parish Police Jury v. Matherne, 394 So.2d 1302 (La.App. 1st Cir.1981). This broad interpretation was specifically rejected in Matherne, 405 So.2d at 316-317. The Louisiana Supreme Court recognized that a local governing body could utilize 38:113 to send workers and equipment on to private property to prevent obstruction of public drainage channels and perform ordinary maintenance necessary for the efficient operation of such channels, but expressly held 38:113 did not authorize the taking or damaging of private property without just compensation or without due process of law.[1] The court further observed that while it may be desirable and in the public interest to take property or prevent its enjoyment to promote the overall efficiency of a drainage system, the lawful method to achieve this is through expropriation. However, since the judgment in the injunction proceedings is now final, it is the law between the parties.
In the instant case, the Jury performed its work on Matherne's property by authority of a final judgment which granted it injunctive relief to do so and denied Matherne an injunction to stop it. This relief was granted pursuant to what we consider to be an erroneous interpretation of 38:113, but because the judgment is final, this fact is no longer relevant. Because the Jury did its work pursuant to a final judgment, the discussion in Section I of the lead opinion about whether this work was "ordinary maintenance" and whether the Jury acted in "bad faith" is unnecessary to the opinion.
We do not agree with the statement in Section II of the lead opinion that "[t]he taking and damaging of property occurred as a result of the defendant exceeding the scope of authority granted it by La.R.S. 38:113." The work was done lawfully pursuant to a final judgment, albeit a judgment based on an erroneous interpretation of 38:113.
Further, because the Jury went on the property and did the work pursuant to a final (and thus lawful) judgment, this conduct is not tortious. For La.C.C. art. 2315 to be applicable, there must be fault. Because the Jury had lawful authority to go on the property and do the work, this is not an inverse condemnation. Matherne is entitled to recover damages because the Jury agreed to pay damages, because the district court in the injunction proceeding found the Jury had an obligation to do so to render 38:113 constitutional and because all parties herein concede Matherne is entitled to such.
We agree with the method used in the lead opinion to calculate these damages and with the handling of the assignment of error in Section III thereof.
NOTES
[1] In this suit, Matherne did not contest the constitutionality of La.R.S. 38:113.
[2] One acre equals 43,560 square feet.
[1] La.R.S. 38:113 appears to establish a legal, predial servitude. La.C.C. arts. 646, 654, 659 and 665. Does not the statutory establishment of such a servitude constitute a taking for purposes of La. Const. of 1974, art. I, § 4?