715 So.2d 15 (1998)
Huston R. WILLIAMS, et al.
v.
CITY OF BATON ROUGE, Parish of East Baton Rouge, et al.
John RABY, et al.
v.
CITY OF BATON ROUGE, Parish of East Baton Rouge, et al.
Nos. 96 CA 0675, 96 CA 0676.
Court of Appeal of Louisiana, First Circuit.
April 30, 1998.
Rehearing Denied June 24, 1998.
*20 Paula Cobb, Baton Rouge, for Plaintiffs/Appellees R. Williams, et al.
Edwin Smith, III, and Harry L. Shoemaker, III, Baton Rouge, for Plaintiffs/Appellees John B. Raby, et al.
James J. Zito and W. Shelby McKenzie, Baton Rouge, for Defendants/First Appellants Parish of East Baton Rouge, et al.
John David Ziober, Baton Rouge, for Defendant/Second Appellant Chicago Insurance Company.
Gracella Simmons, Lafayette, for Defendant/Third Appellant Fidelity and Casualty Company of New York.
William T. McCall, Lake Charles, for Kathleen C. Screen.
*21 Before CARTER, LeBLANC, FITZSIMMONS and KUHN, JJ., and CHIASSON,[1] J. Pro Tem.
REMY CHIASSON, Judge Pro Tem.
This is an appeal of a judgment awarding damages to plaintiffs.

I. FACTS AND PROCEDURAL BACKGROUND
Plaintiffs, the Williams family, the Gage family, and the Raby family, are owners of three adjoining tracts of land located on Staring Lane in Baton Rouge, Louisiana.[2] The property is primarily undeveloped land with a few houses, but the Raby tract has a small hotel located on it. In 1954, the Gage family granted a drainage servitude to the Department of Highways of the State of Louisiana, of which only a portion had been utilized to create a small ditch (the 1954 servitude ditch) in front of the Gage tract. When the Staring Lane roadway was created, a culvert box was tied into the 1954 servitude ditch for the outflow of rainfall runoff.
On the morning of January 6, 1984, defendant, the City of Baton Rouge and the Parish of East Baton Rouge (City/Parish), through the Department of Public Works (DPW), sent employees to plaintiffs' property. Escorted by police officers of the City/Parish, DPW workers arrived with heavy construction equipment for an excavation project. Plaintiffs objected to their presence. Plaintiff, John Raby, demanded a court order from DPW officials. When DPW employee, Emmett Braud, presented some "papers," Mr. Raby requested that the accompanying City/Parish police officer, Michael Shavers, serve him with the DPW papers. Upon review of those papers, Officer Shavers did not believe DPW had the necessary authority to enter plaintiffs' property. At Mr. Raby's invitation, Officer Shavers used a phone to contact the police department's legal advisor, Richard Redd. Mr. Redd advised Officer Shavers that the papers did not authorize DPW's entry onto plaintiffs' property.
Mr. Braud advised Officer Shavers that DPW Assistant Director Robert Atkinson had assured him the papers were all that was needed. After discussions with Mr. Atkinson, Mr. Braud and Officer Shavers went to a nearby shopping center to call Mayor James Patrick (Pat) Screen, Jr. Officer Shavers explained to the mayor that Mr. Redd had advised him the papers DPW had did not authorize entry onto plaintiffs' property. Mayor Screen responded that he was a lawyer and Mr. Redd's boss, and Officer Shaver's boss, that he knew DPW had the authority to enter the plaintiffs' property, and that Officer Shavers was "to do it." Officer Shavers told the mayor that he would check with his supervisor, Major Satterwhite.[3]
Upon contacting Major Satterwhite, Officer Shavers was given "a direct order to go out [to the plaintiffs' property] and to assist [DPW]." Officer Shavers told Major Satterwhite that he would do so, but only after he spoke to Chief of Police Patrick Bonanno to explain the situation. Major Satterwhite subsequently advised Officer Shavers that he had talked to Chief Bonanno, who had talked to the mayor, and that Officer Shavers was being given "a direct order" to assist DPW.
At approximately 11:00 a.m., Officer Shavers returned to the plaintiffs' property and, pursuant to the direct order, assisted DPW. Thereafter, the City/Parish maintained a 24-hour police presence at the excavation site throughout the project until its completion. The City/Parish police officers assigned to detail the DPW project sat in a marked police vehicle, parked on Staring Lane, from 8:00 a.m. through 4:00 p.m. Private security guards hired by the City/Parish performed the security duties during the night hours.
*22 Once the property had been secured by the City/Parish police, DPW commenced the excavation project. Employees for DPW dug three canals: one canal runs through the front of all three parcels of land,[4] and a second canal traverses the adjoining tracts through the back; the third canal runs along the property line on the western edge of only the Williams tract. The project apparently took DPW between one and two months to complete.
Prior to the events on January 6, 1984, the City/Parish had received complaints from at least one resident of a subdivision adjacent to the plaintiffs' property, regarding problems with street flooding on Staring Lane. The gist of the complaints was that plaintiffs were permitting their property to be used as a landfill and specifically that they were filling in a ditch in the front of the Gage property with assorted types of fill. In May 1983, the City/Parish filed a suit for injunctive relief against the plaintiffs alleging that they were allowing refuse material to be dumped into a natural drainage channel, and that despite the City/Parish's attempt to have the landfill operations terminated, plaintiffs had refused to do so. At the hearing for the preliminary injunction, plaintiff John Raby was the only property owner present. The trial court granted the City/Parish the injunctive relief requested. Despite the court order, the ditch continued to be filled; the City/Parish filed a rule for contempt against John Raby. In November 1983, a motion to continue the rule was signed. The motion stated that "the parties ... are in the midst ... of hopefully finding a solution to the problems presented by this litigation [for injunctive relief] and would appreciate ... time within which to ... find a workable solution to the problems presented by this litigation." The matter has never been resumed; nor has the City/Parish ever instituted an expropriation proceeding to take the property that is the subject of this lawsuit.
On August 4, 1986, the Williams and Gage families filed a petition for damages; on August 25, 1986, the Raby family filed a similar petition based on the City/Parish's actions commencing on January 6, 1984.[5] By order dated April 28, 1990, the two suits were consolidated. The petitions[6] name as defendants: the City/Parish, DPW, Mayor Pat Screen, police officers Michael Shavers, Rickey Eiermann and Major Satterwhite of the Baton Rouge Police Department, DPW Director William Addison, DPW Assistant Director Robert Atkinson and DPW employee Emmett Braud. Additionally, Fidelity & Casualty Insurance Company (F & C) and Chicago Fire Insurance Company (Chicago) were named as the alleged insurers for all defendants.
After a five day trial on the merits, the trial court concluded the City/Parish and defendants Mayor Screen and DPW Director Addison, in both their official and individual capacities, were liable to plaintiffs and awarded damages totaling over $1,000,000.00. The trial court also concluded neither the F & C nor the Chicago insurance policy provided coverage to those defendants cast in judgment. A judgment in conformity with the trial court's rulings was signed on January 26, 1995. Plaintiffs, as well as the City/Parish, Mayor Screen, DPW Director Addison, Chicago, and F & C filed motions for new trial.[7] After a hearing on May 1, 1995, the trial court determined neither Mayor Screen nor DPW Director Addison was liable in his individual capacity; additionally, the trial court reversed its earlier ruling and concluded both Chicago and F & C provided coverage for the defendants cast. In all other *23 respects, the motion for new trial was denied. A judgment reflecting the trial court's determinations was signed September 12, 1995. From that judgment, the City/Parish, Chicago, and F & C have appealed. Plaintiffs have answered the appeal. The issues raised by the parties are as follows.
By all defendants:
(1) Whether the trial court erred in denying the City/Parish's peremptory exception raising the objection of res judicata;
(2) Whether the trial court erred in allowing plaintiffs' recovery under any theory of liability other than inverse condemnation, which permits awards for property damages and severance damages only;
(3) Whether the trial court erred in allowing plaintiffs any recovery other than the market value of their property because of their failure to mitigate their damages by taking legal action to prevent the City/Parish from performing the excavation work on their property;
(4) Whether the trial court erred in awarding recovery for mental anguish under any theory of liability;
(5) Whether the trial court erred by awarding plaintiffs' experts excessive fees because the expert testimony was of little value to the trial court's determination of damages;
(6) Whether the trial court erred in awarding plaintiffs attorney's fees.

By plaintiffs:[8]
(7) Whether the trial court's determination of damages is excessively low;
(8) Whether the trial court's awards of attorney's fees are abusively low;
(9) Whether the trial court's awards of expert fees are excessively low.
By Chicago and F & C:
(10) Whether either or both of the insurance policies provide coverage for all or part of the damages under the facts of this case.

II. RES JUDICATA
A threshold issue defendants raise in this appeal is whether the trial court erred in denying a peremptory exception raising the objection of res judicata. Defendants assert the issue of whether a natural drain existed is res judicata and urge that a judgment, signed on June 14, 1983, supports their assertion. That judgment provides, in pertinent part:
IT IS ORDERED, ADJUDGED AND DECREED that a preliminary injunction issue herein directed to John Raby prohibiting the defendant from dumping any fill of any type or nature whatsoever in the natural drainage areas that cross his property.... (Emphasis added.)
Defendants contend that because in the oral reasons for judgment the trial court determined a natural drain existed on the Raby family property, and because the City/Parish actions on January 6, 1984, constituted maintenance of that natural drain and were in conformity with the location of the natural drain as set forth in the oral reasons for judgment, the June 14, 1983 judgment bars plaintiffs' cause of action against the City/Parish under the doctrine of res judicata.
When plaintiffs filed their petitions for damages in August, 1986, La.R.S. 13:4231 provided:
The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against *24 each other in the same quality.[9] (Footnote added.)
The trial court properly denied defendants' exception of res judicata. On May 26, 1983, the City/Parish filed for a preliminary injunction in its favor and against the defendants. However, the plaintiffs' petitions in this case seek damages, and not an injunction; thus, the thing demanded is not the same in both lawsuits. Additionally, the 1983 judgment, on its face, issued an injunction directed only to John Raby. Therefore, as to all other plaintiffs in these consolidated lawsuits, the demand filed in August, 1986, is not between the same parties.

III. LIABILITY OF CITY/PARISH

A. Trespass
In its written reasons for judgment, the trial court expressly concluded that the City/Parish was liable to plaintiffs under state tort law. In so concluding, the trial court found that the City/Parish's actions on January 6, 1984, amounted to a trespass.[10]
Article 2315 of the Louisiana Civil Code provides that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. Recovery for the tort of trespass is recognized by courts throughout this state as a means to correct the damage caused when an owner is unjustly deprived of the use and enjoyment of his immovable property. See Britt Builders, Inc. v. Brister, 92-1586 (La.App. 1st Cir. 4/23/93); 618 So.2d 899.
The tort of trespass is defined as the unlawful physical invasion of the property of another. Dickie's Sportsman's Centers, Inc. v. Dept. of Transportation and Development, 477 So.2d 744, 750 (La.App. 1st Cir.), writ denied, 478 So.2d 530 (La.1985). A trespasser is one who goes on another's property without the other's consent.[11]Williams v. J.B. Levert Land Company, Inc., 162 So.2d 53, 58 (La.App. 1st Cir.), writ refused, 245 La. 1081, 162 So.2d 574 (1964).
The record shows that the plaintiffs did not give their consent to DPW to enter their premises and undertake the excavation project. Despite their attempts on appeal to characterize their actions as something other than trespass, defendants have not established a lawful reason for their presence on plaintiffs' property, such as an exercise of the power of eminent domain. Thus, the occupation of plaintiffs' property by DPW commencing on January 6, 1984, clearly constituted a trespass. In fact, the trial court concluded that the presence of the ditches constituted a "continuing trespass," relying on the case of M & A Farms, Ltd. v. Town of Ville Platte, 422 So.2d 708, 711-12 (La.App. 3d Cir.1982). As noted in that case, a continuing trespass occurs where the defendant erects a structure or places an object upon the land of the plaintiff and fails to remove it. The trespass continues as long as the object remains on the premises, and the trespass is terminated only by the removal of the object wrongfully placed there. Id. Although DPW vacated the premises approximately two months after entering it, the DPW created three ditches that remained on the property; thus, the trespass in this case is a continuing trespass. Accordingly, we find no error in the trial court's conclusion that, under the facts of this case, plaintiffs are entitled *25 to recover damages under state tort law for trespass.

IV. DAMAGES
A person damaged by trespass is entitled to full indemnification. Where there is a legal right to recovery, but the damages cannot be assessed exactly, the courts have reasonable discretion to assess the value based on all of the facts and circumstances of the action. Damages are recoverable even though the tortfeasor acts in good faith. Versai Management, Inc. v. Monticello Forest Products Corp., 479 So.2d 477, 484 (La. App. 1st Cir.1985).
Damages for dispossession of one's property are regarded as an award of compensatory damages for violation of a recognized property right and are not confined to proof of actual pecuniary loss. Mental anguish, humiliation, and embarrassment are appropriate considerations. Owens v. Smith, 541 So.2d 950, 955 (La.App. 2d Cir.1989). Damages are recoverable for unauthorized activities performed on the property of another, and are calculated on physical property damage, invasion of privacy, inconvenience, and mental and physical suffering. See Beacham v. Hardy Outdoor Advertising, Inc., 520 So.2d 1086, 1091 (La.App. 2d Cir. 1987). In the instant case, plaintiffs are entitled to full indemnification for the damages caused by the City/Parish's trespass. See Britt Builders, Inc., 618 So.2d at 903.
The trier of fact is given much discretion in the assessment of damages. Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. La.C.C. art. 2324.1; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979).
On appeal, defendants urge the trial court's awards of any damages except for fair market value of the land taken are erroneous. Additionally, defendants assert the quantum of the trial court's awards for mental anguish is excessive and amounts to an abuse of discretion. All plaintiffs contend the quantum of the trial court's awards for property damages is erroneously low. Additionally, the Williams and Gage families maintain the quantum of the trial court's awards for mental anguish is abusively low. Except for minor changes, we will not disturb any of the awards.

A. Property Damages[12]

1. Tracts of Land
When property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the damage. Roman Catholic Church v. Louisiana Gas Service Co., 618 So.2d 874, 876 (La.1993). When damage to property is assessed, no mechanical rule can be applied with exactitude. Justice, reason, and the principle of full reparation of La.C.C. art. 2315 require that, where an individual's property is damaged unlawfully by a tortfeasor for no good reason, the owner be compensated at least as fully as when his property is damaged by the state for a public purpose. Id.
We note that the proper measure of damages when a governmental entity exercises its power of eminent domain is the lesser of (1) the market value of the property and severance damages minus any residual value or (2) the cost of restoring the property to its condition at the time the taking was initiated. Matherne v. Terrebonne Parish Police Jury, 462 So.2d 274, 279 (La.App. 1st Cir.1984). Severance damages are normally calculated as the difference in value of the remaining property before and after the taking. See Hobgood v. Parish of East Baton Rouge, 563 So.2d 413, 419 (La.App. 1st Cir.), *26 writ denied, 567 So.2d 105 (La.1990). Cost to cure is an appropriate method of determining damages and may be resorted to in unique situations and special instances wherein ascertainment of market value is not otherwise possible. See State, Dep't. of Highways v. Salassi, 244 So.2d 871, 875 (La. App. 1st Cir.1971).

a. Gage family
The trial court awarded $56,000.00 to all classes of Gage family plaintiffs for property damage to their land,[13] and we find no error in the award. On appeal, the Gage family asks this court to conclude that the property is useless and to award them the fair market value of the entire tract before it was damaged; or alternatively that the award be affirmed.
Plaintiffs' expert in real estate appraisal, Oren Russell, made a study of comparable property sold in the vicinity of plaintiffs' property and determined each tract of land, including that owned by the Gages, had a fair market value of $28,000.00 per acre on January 5, 1984, prior to the damage by the City/Parish. Mr. Russell calculated the fair market value of the 10-acre Gage property was $280,000.00. Mr. Russell stated the highest and best use for this 10-acre tract would be as a detached, single family residential subdivision, and he described a development cost analysis[14] based on the amount a reasonable developer would have paid for the property before the DPW excavation project. Mr. Russell explained that if a reasonable developer purchased the Gage tract for $240,000.00, he would not make a profit; a reasonable developer could afford to develop the property only if he could acquire the Gage tract for a price between $240,000.00 and $125,000.00. The difference in the value of the tract before and after the harm by the City/Parish, according to Mr. Russell, was between $40,000.00 and $155,000.00. The trial court's award of $56,000.00 to the Gage family plaintiffs for the property damage to their tract of land is clearly within this range and, therefore, is not erroneous.[15]
The Gage family relies on Day v. Warren, 524 So.2d 1383, 1387 (La.App. 1st Cir.1988), to support their assertion that they are entitled to the fair market value of the entirety of its property. In Day, this court explained that the proper measure of damages where land has been rendered useless includes the right of the owner to recover the market value of the land when the cost of restoration exceeds the value of the land. Id. There is no evidence indicating the Gage tract of land was rendered useless by the DPW excavation project. Thus, the Gage family's reliance on Day is misplaced.
We note that plaintiffs put forth testimony by Mr. Boudreaux suggesting the amount it would cost to restore the Gages' property. However, Mr. Boudreaux admitted that the plan upon which he had based those costs actually resulted in an enhanced value to the property.[16] Finding that the award to the Gage family for property damage is not inadequate, we find no abuse of discretion in the property damage award to the Gage family. Accordingly, we affirm the award of $56,000.00.

b. Williams family
The trial court awarded $74,000.00 to the Williams family plaintiffs for the property *27 damage to their tract of land. As was the case with the Gage family plaintiffs, on appeal, the Williams family asks that this court award them the market value of the entire tract prior to the damage by the City/Parish. Alternatively, they request that we affirm the trial court's property damage award.
Mr. Boudreaux determined the costs to restore the Williams tract to its former condition, but the plan formulated by him, like the one for the Gage property, resulted in an enhancement to the value of the property. Mr. Boudreaux testified that the cost to restore the Williams property would be $234,020.00. At $28,000.00 per acre, the fair market value of the Williams property before the DPW excavation project was $146,000.00, an amount significantly less than the costs involved in restoring the Williams land. Thus, the trial court was correct in rejecting valuation of the property on the basis of costs of restoration.
The only evidence regarding the before and after method of valuation of the Williams property was presented by Mr. Russell. He testified that, like the Gage property, the highest and best use for the Williams property would be to develop it into detached, single-family residences. However, Mr. Russell conceded that for the Williams property to be subdivided successfully, the smaller approximately five-acre tract would have to join with another, adjacent tract of approximately equal area. By awarding the Williams family plaintiffs $74,000.00, the trial court must have rejected the before/after method of valuation based on subdivision of the Williams tract,[17] which was not clearly wrong.
In its determination of the amount of property damage to the Williams tract, the trial court apparently combined the fair market value of the land upon which the ditches are located and added to that a sum representing the costs of constructing bridges for vehicular and pedestrian use across each ditch. The latter amount, referred to as the "cost to cure," permitted restoration of the contiguous nature the Williams tract had prior to the damage by the City/Parish. This additional amount, the cost to cure, would be considered an award of severance damages if the City/Parish had invoked an expropriation proceeding or had there been an inverse condemnation.
Defendants urge the Williams family plaintiffs are entitled to recover only $44,160.00, the fair market value of the land damaged, essentially asserting that plaintiffs are not entitled to the additional $29,840.00 the trial court awarded entitled "cost to cure." Mindful of the supreme court's directive in Roman Catholic Church, that a tortfeasor who has damaged the property of another should be liable for compensation at least as extensive as when property is damaged for a public purpose, we find no error in the trial court's approach to valuation of the subject property under the facts of this case. To hold otherwise would have the reprehensible effect of allowing the tortfeasor City/Parish to pay an amount less than the amount the City/Parish would have had to compensate the Williams had it duly exercised its power of eminent domain.
Mr. Boudreaux testified the cost of constructing bridges across the three ditches DPW excavated on the Williams family property was $29,840.00. We find the trial court's award of $29,840.00 for the damage to the remainder of their tract based on cost to cure is supported by the evidence and is not erroneous under the facts of this case.
The Williams family plaintiffs, like the Gages, rely on Day to urge recovery of the fair market value of the entirety of their property. Like the Gage family, the Williams family's reliance is misplaced because they have failed to demonstrate that the property was rendered useless by the presence of the ditches.
For these reasons, we find no error in the trial court's award of property damages in the amount of $74,000.00 to the Williams family.

*28 c. Raby family
The trial court awarded to Mr. and Mrs. John B. Raby, in community, the amount of $80,000.00 for property damage to their tract of land. Based on the evidence, the trial court must have determined the Rabys were entitled to $10,037.00 for the fair market value of the land upon which the ditches were constructed, $40,000.00 for the difference before and after the damage to the remainder of the tract, and $30,500.00 for the cost to add a bridge as part of the subdivision plan. Apparently, in making its award, the trial court rounded the sum to $80,000.00.
Defendants contend they are liable only for the fair market value of the property actually damaged in the amount of $10,037.00. They suggest the $80,000.00 award for property damage includes the before/after value to the remainder of the tract, as well as a sum to construct a bridge, and amounts to the Rabys recovering twice for the damage to the remainder of their tract. The Rabys urge that the trial court erred in rounding off the amount awarded and request a $537.00 adjustment in the award to conform to the evidence.
We note first that Mr. Boudreaux's testimony established the cost of restoring the ditch in front of the Raby tract of land was $55,397.00, and while the record does not reflect the cost of restoring the ditch in the back of the Raby tract, on appeal, the Rabys do not seek restoration costs as the correct value of the property.
Mr. Russell testified to the same development cost analysis for the Raby tract as he set forth for the Williams property. By joining with a neighboring property, the Raby tract could be subdivided and sold as single-dwelling residences, which he concluded was the highest and best use for the land. Based on his calculations, a developer who would have paid $140,000.00 for the approximately five-acre tract of land with the ditches, could only afford to pay $100,000.00 for that same tract of land after the DPW excavation project. Thus, under this theory, Mr. Russell concluded the loss in value to the remainder of the Raby tract was $40,000.00.
It was not error for the trial court to award the fair market value of the land upon which the ditches were constructed plus a sum representing the damage to the remainder of the tract, which is the before/after value. However, we agree with defendants that by awarding both the before/after value and the cost of constructing a bridge, the court has awarded the Rabys double recovery. We will amend the award for the damage to the remainder of the tract to $40,000.00, the difference in the value before and after the harm. When added to the $10,037.00 award for the damage to the land upon which the ditches were constructed, the total property damage to the Rabys for their tract of land is $50,037.00.
We find no error in the trial court's use of different methods of valuation for the Williams family's and the Rabys' respective tracts of land. While the two tracts originally were similar in size, and the amount awarded to the Rabys for property damage to their tract is greater than the amount awarded for damages to the Williams' tract, we cannot say the trial court was clearly wrong or manifestly erroneous in these awards. Of the three tracts of land at the heart of this dispute, only the Raby tract had been utilized in a commercial manner. The trial court may have determined that only the Rabys would have actually commercially developed the land, and the evidence duly supports such a finding.
Accordingly, we amend the trial court's award of property damage to the Rabys for the damages their tract of land sustained to $50,037.00.

2. Raby parking lot
The trial court awarded Mr. and Mrs. John B. Raby, in community, the amount of $50,000.00 for damage to their parking lot. The only contention raised by defendants on appeal is their general defense that because the City/Parish was acting pursuant to its power of eminent domain, no damages are owed.[18] However, the victims *29 of trespass are entitled to be restored to their former position. Mr. Boudreaux testified that the cost to repair the broken concrete squares of the Raby parking lot was $51,860.00. The Rabys have answered this appeal and request that the award be amended to conform to the evidence. Because there was no evidence to the contrary, we agree with the Rabys and, accordingly, increase the award for property damage to their parking lot from $50,000.00 to $51,860.00.

3. Personal property
The trial court awarded $500.00 to Huston Williams and $150.00 to Leroy Williams for personal property damage. In their answer to this appeal, these plaintiffs request the awards be modified to conform to the evidence.
Huston Williams testified that about three days after DPW had commenced excavation on the Gages' property, he was notified by his sister, Louise, that DPW had destroyed materials he had been collecting. He confirmed an itemized list of the materials admitted into evidence and verified that the value of those items was $1,223.09. No evidence to the contrary was submitted to the trial court.
Leroy Williams testified that he had a small tin building with items he was saving for a house he was building in Zachary, Louisiana. According to his testimony, those items included baseboards, window casings, and shoe moldings. He stated that DPW workers burned up the building and the materials and estimated that the fair market value of the materials in 1984 was $350.00. There was no other evidence in the record regarding the value of this property.
Although the trial court has great discretion in estimating damages in a case like this, the primary objective is to restore the injured party in as near a fashion as possible to the state in existence at the time immediately preceding the injury. The usual tests do not always apply to achieve this result in the case of personal items. See Farr v. Johnson, 308 So.2d 884, 887 (La.App. 2d Cir.), writs not considered, 310 So.2d 854, 315 So.2d 143 (La.1975).
Because there was no other evidence as to the values of Huston and Leroy Williams' personal property, we will amend their awards to conform to the evidence. Thus, the award of $500.00 to Huston Williams is increased to $1,223.09, and the award to Leroy Williams of $150.00 is increased to $350.00.

B. Mental Anguish[19]
We turn now to an examination of the awards made by the trial court for *30 mental anguish. In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court in discussing awards of general damages noted:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In reviewing an award of damages, an appellate court should not rely on a comparison of other awards in other cases to determine if a particular award is appropriate. A comparative analysis should be undertaken only after the appellate court has found an abuse of discretion. In Youn v. Maritime Overseas Corp., 623 So.2d at 1260, (citing Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976)) the court stated: "Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion."
The trial court awarded damages for mental anguish[20] as follows.
Williams family plaintiffs:
Class ILouise Jackson: $88,000.00, for mental anguish, inconvenience, and embarrassment;[21]
Class IIHuston Williams, Willie Williams, Leroy Williams, Bernice (Williams) Christopher, Gloria (Williams) Taylor, and Alzetia (Williams) Davis: $28,000.00 each for mental anguish;
Gage family plaintiffs:
Class IBeatrice (Gage) Harris and Irma (Gage) Carr: $75,000.00 each for mental anguish;[22]
Earline (Gage) Howard: $47,500.00;[23]
Class IIOphelia Simmons, Evelyn (Gage) Sagna and Lubertha Ethel *31 (Gage) Johnson: $28,000.00 for mental anguish;
Ulysses Gage, Jr. and Leroy Gage for Ulysses Gage, Sr.: $20,000.00;[24]
Leonard Gage: $ 10,000.00;[25]
The Rabys:
John B. Raby: $88,000.00 for mental anguish;
Ida Jane (Mrs. John B.) Raby: $75,000.00 for mental anguish;
John Raby, Jr. and Kathy Raby: $25,000.00 each for mental anguish.
On appeal, defendants urge the trial court erred because plaintiffs failed to prove psychic trauma of the nature or similar to physical injury. They further assert that even if plaintiffs are entitled to general damage awards, the amounts awarded by the trial court are abusively excessive. Plaintiffs, the Williams and Gage families, urge the general damage awards are abusively low.
An award for mental anguish as a result of damage to property is normally permitted in four instances: (1) property damaged by an intentional or illegal act; (2) property damaged by acts for which the tortfeasor will be strictly or absolutely liable; (3) property damaged by acts constituting a continuous nuisance; and (4) property damaged at a time which the owner thereof is present or situated nearby and the owner experiences trauma as a result. Louisiana Farm Bureau Mut. Ins. Co. v. Dunn, 484 So.2d 853, 856 (La.App. 1st Cir.1986). Where the defendant trespasses upon plaintiff's property, it is clear plaintiff is entitled to recover damages for anguish, humiliation and embarrassment. Britt Builders, Inc. v. Brister, 618 So.2d at 903.
In the case sub judice, the trial court awarded general damages not only to Class I plaintiffs (those who were physically present and living on the land at the time of these events) but also to Class II plaintiffs (those who no longer lived on the family land but who continued to have contact with the family homes). Because the Class II plaintiffs were not in close proximity at the time of the trespass, the trial court apparently determined that the City/Parish's damage to plaintiffs' property was an illegal act. We cannot say that finding is manifestly erroneous or clearly wrong.
It is clear that the excavation project, which was a trespass by the City/Parish, lasted approximately two months subsequent to January 6, 1984, and continued thereafter by the presence of the ditches on the plaintiffs' property. Plaintiffs suffered a most egregious violation of their private property ownership rights, and each testified that he or she was depressed and saddened by the actions of the City/Parish. Both the Williams family and the Gage family plaintiffs' collective testimony established that they were saddened due, in no small part, to the personal sacrifices their respective parents made to ensure that plaintiffs would be property owners; DPW's actions commencing on January 6, 1984, cast a long shadow on their parents' efforts. Frequent family reunions on the property were discontinued after DPW created the ditches. Plaintiffs testified that returning to the property after it was all dug up was simply too painful.
Plaintiffs endured some public exposure. John Raby's picture was printed in the newspaper, and television reporting crews were present at the time DPW arrived on the property accompanied by a police escort. During the entire time of the project and in broad daylight, a marked police vehicle guarded the location for all to see; at night, there were private security guards.
The collective evidence of plaintiffs established that during the excavation project, DPW draglines and bulldozers began at 6 A.M. and did not stop running until 6 P.M. The continuous noise was a constant aggravation; if it was not raining, the machines were running. Plaintiffs testified that even when it appeared there was no use for the machines, DPW ran them all day long. Ida Jane Raby testified that during the time *32 DPW was on her property, her asthma condition was exacerbated and she was required to utilize more medicine than usual. She explained that, because she has heart problems, the use of more medicine created a dangerous situation for her. The noise apparently interfered with her ability to engage in her typical hobbies and caused her stress.
The constant police presence was another source of anxiety for the plaintiffs. Several plaintiffs testified that they felt threatened and intimidated when a policeman with a shotgun was seen in the vicinity of the property on January 6, 1984, prior to commencement of the excavation project. Class I plaintiffs and the Rabys[26] explained that the police presence was like being under house arrest and that they felt humiliated and embarrassed.
There was a significant amount of testimony from Class I plaintiffs and the Rabys, all of whom reside on the property, regarding the presence of snakes, mosquitoes and rats in the ditches. Louise Jackson expressed fear and concern for the minor children who reside in her household due to the additional pestilence, as well as the likelihood that a child may fall into one the ditches. She has had to curtail their outdoor activities.
All of the plaintiffs testified that the loss of the contiguous nature of their property was most painful. Several of the Class II plaintiffs, and John Raby, testified that because of their inability to cross the ditches and the loss of land, they had to forego gardening, a hobby they had consistently participated in for many years.
While defendants correctly point out that plaintiffs have failed to produce evidence of psychic trauma of the nature or similar to physical injury, they are still entitled to recover for the mental anguish they endured. See Bostwick v. Avis Rent-A-Car, 215 So.2d 854, 857 (La.App. 1st Cir.1968). However, the presence of the ditches, no doubt, was a constant and painful reminder of the indignity the plaintiffs endured, and we cannot say the awards were an abuse of the trial court's much discretion.

C. Inadequate Damages
As to the claims on appeal by the Gage and Williams families that the damages are inadequate, we acknowledge that plaintiffs are entitled to full indemnification for the damages caused by the City/Parish's trespass. See Britt Builders, Inc., 618 So.2d at 903. However, even when we consider whether an award should be increased rather than decreased, our responsibility on appeal is to determine whether the trier of fact abused its discretion in making these particular awards. See Paige v. Safeco Ins. Co. of America, 404 So.2d 1319, 1321 (La.App. 2d Cir.1981), citing Reck v. Stevens, 373 So.2d 498, 500 (La.1979). Although the actions of the defendants in the instant case were most egregious, the damages are to compensate the victims for their losses, not to punish the defendants. Thus, we cannot say the trial court abused its discretion in failing to award more. Plaintiffs' contentions to the contrary in their answers to the appeal are without merit.

V. ATTORNEY FEES
The trial court awarded $15,000.00 each to the Gage family, the Williams family, and the Raby family in attorney fees. Defendants urge the award is erroneous. Plaintiffs contend, however, that La.R.S. 13:5111 supports the attorney fees award.[27]
In relevant part, La.R.S. 13:5111(A) provides:
A court of Louisiana rendering judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of *33 the court, compensate for reasonable attorney fees actually incurred because of such proceeding. (Emphasis added.)
We have already concluded that the DPW excavation project commencing on January 6, 1984, was not for public purposes; thus, an award of attorney fees pursuant to La.-Const. art. 1, sec. 4 cannot be made. However, public purpose is not a requirement of the above quoted statute. All that is required is that there be a taking. A "taking" has been defined as "substantial interference with the free use and enjoyment of property." State, Through Department of Transportation and Development v. Chambers Investment Company, Inc., 595 So.2d 598, 602 (La.1992). The record supports the conclusion that the City/Parish's actions amounted to a taking. See Simmons v. Board of Commissioners of the Bossier Levee District, 25,093, 25,094 (La.App.2d Cir. 9/22/93); 624 So.2d 935. Because we conclude that La.-R.S. 13:5111 provides a basis for recovery of attorney fees under the facts of this case, we need not discuss the applicability vel non of 42 U.S.C. § 1983.
We disagree with the plaintiffs' claim that the awards of attorney fees should be increased, as we find the amounts in keeping with the facts and circumstances of the instant case. We agree with our brethren of the second circuit that the awards for mental anguish should not be considered when attorney fees awarded pursuant to La.-R.S. 13:5111 are calculated. Simmons, 624 So.2d at 955.

VI. EXPERT FEES
The trial court awarded expert fees to plaintiffs as follows. To the Williams family: $1,000.00 for real estate appraisal services and $3,500.00 for engineering services; to the Gage family: $1,000.00 for real estate appraisal services and $3,000.00 for engineering services; and to the Raby family: $6,000.00 for real estate services and $5,000.00 for engineering services. Defendants assert that the awards are excessive and suggest that because the testimony of both the expert witnesses was of little or no value to the trial court in its determination of damages, the amounts awarded should be reduced. The Gage and the Williams families maintain that the fees are recoverable under 42 U.S.C.A. § 1983. The Raby family plaintiffs urge the expert fees should be taxed as costs. Because plaintiffs' recovery is not based on violations of § 1983, we consider only the assertion that the expert fees be taxed as costs.
In relevant part La.R.S. 13:3666(B)(1) provides:
The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment ...
[f]rom the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause ... the court shall determine the amount thereof and include same.
Generally, the amount and fixing of expert witness fees lies within the sound discretion of the trial court and will not be disturbed in the absence of an abuse of discretion. Albin v. Illinois Cent. Gulf R.R. Co., 607 So.2d 844, 845 (La.App. 1st Cir. 1992). Factors to be considered by the trial judge in setting an expert witness fee include time spent testifying, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of the work performed, and the knowledge, attainments and skill of the expert. Id. Additional considerations include helpfulness of the expert's report and testimony to the trial court, the amount in controversy, the complexity of the problem addressed by the expert and awards to experts in similar cases. Expert witnesses are entitled only to reasonable compensation. Id. The amount agreed upon between an expert witness and the party calling him is not the criterion to be used by the court in assessing expert fees. Id.
Based on the record before us, we cannot say the trial court abused its sound discretion in any of its awards of expert fees. The trial court relied heavily on the testimony of Mr. Russell in calculating all the property damage awards.
The trial court's awards to the Gage and Williams family plaintiffs for Mr. Boudreaux's *34 services totaled $6,500.00. Mr. Boudreaux submitted a bill of $15,010.00 for engineering services, and these plaintiffs request this court adjust the award to conform to Mr. Boudreaux's bill. Much of the engineer's testimony relative to the Gage and Williams family plaintiffs was directed to restoration of their property; however, as indicated above, the restoration plan presented by Mr. Boudreaux actually enhanced the value of plaintiffs' property and was of no value to the trial court. Insofar as the award to the Raby family for engineering services, we note the additional preparation required to determine the cost of restoration of their parking lot, and the trial court's reliance on that testimony, were clearly factored into the award of $5,000.00. We cannot say the trial court abused its discretion in its awards for engineering services to plaintiffs.

VII. INSURANCE COVERAGE[28]
During the time of the DPW excavation project on plaintiffs' property, the City/Parish was insured by F & C under a commercial general liability policy, in excess of the City/Parish's $100,000.00 self-insurance retention. The F & C policy has liability limits of $400,000.00; Chicago, excess insurer for the City/Parish, provides coverage for liability in excess of $500,000.00. F & C and Chicago urge the trial court erred in its conclusion regarding the liability of each of the insurers under the terms of the policies.

A. F & C's policy
F & C and Chicago assert two bases to support their argument that there is no coverage under the F & C policy. First, they maintain that the policy must be read as a whole; for coverage, the insured must meet the threshold requirement of establishing that its conduct constituted an "occurrence" as defined in the policy. Secondly, they urge that under the plain language of the exclusions set forth in that section, the insured is not afforded coverage. In finding coverage, the trial court concluded that the damages awarded to plaintiffs arose out of the "wrongful entry or eviction or other invasion of the right of private occupancy" by the City/Parish.
Turning to the F & C policy, we note Coverage P, designated as "Personal Injury Liability," provides in relevant part:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named insured's business:
* * * * * *
Group C-wrongful entry or eviction, or other invasion of the right of private occupancy;
if such offense is committed during the policy period within the United States.... (Emphasis deleted.)
The Personal Injury Liability section further provides:
Each of the following is an insured under this insurance to the extent set forth below:
* * * * * *
(c) if the named insured is designated in the declarations as other than an individual, partnership or joint venture [as set forth in subsections (a) and (b)], the organization so designated and any executive officer, director or *35 stockholder thereof while acting within the scope of his duties as such.
According to the additional definition explained in the Personal Injury Liability of this section of the F & C policy:
When used in reference to this insurance:
"damages" means only those damages which are payable because of personal injury arising out of an offense to which this insurance applies. (Emphasis deleted.)
We first address the assertion that the F & C policy requires that the City/Parish prove an occurrence before coverage is afforded. The insurers maintain that the section entitled "Personal Injury Liability" must be read in conjunction with the other provisions of the policy. The City/Parish urges that there is nothing in the Personal Injury Liability section that cross-references it to the remainder of the policy. Thus, it contends that under the plain language of the Personal Injury Liability section, the F & C policy affords coverage for the tortious damage to plaintiffs' property without proof of an occurrence.
Where the language in the policy is clear, unambiguous, and expressive of the intent of the parties, the agreement must be enforced as written. Reynolds v. Select Properties, Ltd., 93-1480, p. 3 (La. 4/11/94); 634 So.2d 1180, 1183. However, if after applying the other rules of construction an ambiguity remains, the ambiguous provision is to be construed against the drafter and in favor of the insured. Id. The purpose of liability insurance is to afford the insured protection from damage claims. Policies should be construed to effect, and not to deny, coverage. Id.
Our review of the F & C policy reveals that there is nothing in the Personal Injury Liability section that cross-references the remainder of the policy. Because any ambiguity created by the lack of a cross-reference to the remainder of the F & C policy must be construed in favor of finding coverage,[29] we conclude that under the Personal Injury Liability section of the F & C policy, the City/Parish is not required to prove an occurrence.
Turning now to the insurers' assertion that the Personal Injury Liability section expressly excludes the damages arising from the City/Parish's tortious conduct in this lawsuit, the insurers rely on the following language in the Personal Injury Liability section of the F & C policy:
This insurance does not apply ...
to personal injury arising out of the wilful violation of a penal statute or ordinance committed by or with the knowledge of such person by the named insured....
F & C and Chicago maintain the trial court's conclusion that the City/Parish violated 42 U.S.C. § 1983 constitutes a willful violation of a penal statute or ordinance as contemplated by the exclusionary language. However, we agree with the City/Parish that the trial court's conclusion that the City/Parish violated plaintiffs' civil rights under § 1983 was erroneous;[30] therefore, the insurers may not rely on a § 1983 violation as a basis for invoking this exclusion in the Personal Injury Liability section of the F & C policy.
Alternatively, the insurers contend that the actions of the City/Parish in trespassing onto plaintiffs' property violated La.R.S. 14:63.3, "Entry on or remaining in places on *36 land after being forbidden," and Chapter 4, Secs. 150-152 of the Baton Rouge Code of Ordinances, entitled "Trespass."[31]
The trial court expressly determined that the City/Parish did not willfully commit a crime, and we find the record establishes a reasonable factual basis to support that conclusion. Although Mayor Screen and Director Addison lacked the requisite court order to undertake the excavation project, and thus, were without authority to go onto the plaintiffs' property, the trial court's finding that both of these officials believed that they were acting under color of the City/Parish's power of eminent domain is supported by the evidence, and therefore, is not clearly wrong or manifestly erroneous. Because the trial court's conclusion that the City/Parish did not willfully commit a crime is supported by the evidence, the express exclusionary language in the Personal Injury Liability section of the F & C policy does not preclude coverage under the facts of this case.
We note that the F & C policy definition of "damages," expressly set forth in the Personal Injury Liability section, does not identify particular types of "damages which are payable because of personal injury." Thus, Chicago's suggestion that the F & C policy does not provide coverage for the property damages awarded to plaintiffs is without foundation. Accordingly, we find no error in the trial court's conclusion that the F & C policy provides coverage for all items of damages[32] (in excess of the City/Parish's $100,000.00 self-insurance retention) which plaintiffs sustained due to the City/Parish's actions.

B. Chicago's policy
Chicago maintains that even if there is no requirement of an "occurrence" in F & C's underlying policy, the City/Parish must still establish an "occurrence" in accordance with Endorsement Numbers 4 and 12 of the Chicago policy. Endorsement 4 is entitled "Municipalities Amendatory Endorsement", and provides in pertinent part:
B. It is ... agreed that this policy shall not apply to any liability for:
* * * * * *
(3) Personal injury arising out of a) false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution; or b)... invasion of the rights of privacy;
Unless such liability is covered by valid and collectible underlying insurance as desc[ribed] in the Schedule of Underlying Insurance, and then only for such hazards for which cove[rage] is afforded under said underlying insurance.
All other terms and conditions remain unchanged.
Endorsement 12, entitled "Personal Injury Following Form", states in relevant part:
It is agreed that, except insofar as coverage is provided to the Insured in the underlying insurance, as set forth in the Schedule of Underlying Insurance, this policy does not apply to liability arising out of the following offenses:
* * * * * *
(3) Wrongful entry or eviction, or other invasion of privated (sic) occupancy.
(4) Discrimination, humiliation and mental anguish.
All other terms and conditions remain unchanged.
*37 Chicago concedes that under the language of these endorsements, if F & C's underlying policy provides coverage, its policy also provides coverage; however, the excess insurer maintains the threshold requirement that the damages arise out of an "occurrence" must nevertheless be proven.
The Chicago policy states the following regarding its scope of coverage:
The company agrees to indemnify the insured for all sums which the insured shall become obligated to pay as damages, direct or consequential, and expenses, all as hereinafter defined as included within the term ultimate net loss, by reason of liability
(a) imposed upon the insured by law, or
(b) assumed by the named insured, or by any officer, director, stockholder or employee thereof while acting within the scope of his duties as such, under any contract or agreement,
because of personal injury, property damage, or advertising liability caused by or arising out of an occurrence which takes place during the policy period anywhere in the world.
The policy defines an "occurrence" to mean:
an accident, including a continuous or repeated exposure to conditions, which results ... in a personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured....
Chicago asserts the trial court erred in finding that the personal injury to plaintiffs by the City/Parish was "neither expected nor intended from the standpoint of the insured." We disagree.
Breland v. Schilling, 550 So.2d 609 (La.1989), is the seminal case dealing with the issue of whether a personal injury was expected or intended from the standpoint of the insured. As noted by the supreme court, "The effect of the language used in this exclusion clause is not always clear. In fact, when construed in light of the myriad fact situations to which it has been applied, it is often ambiguous." Breland, 550 So.2d at 610. Ambiguous policy provisions are to be construed against the confector, the insurer. Id. Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered. Id.
The Breland court explained that the subjective intention and expectation of the insured determine which injuries fall within and which fall beyond the scope of coverage under this policy, not the inquiry regarding intentional torts which asks what consequences an objective reasonable person might expect or intend as the result of a deliberate act. Id. at 611.
Applying the Breland holding to the facts before us, we find the evidence supports the trial court's implicit factual finding that the City/Parish did not subjectively intend or expect the injury it caused. From the perspective of the City/Parish officials undertaking the DPW excavation project, they believed they were duly exercising the City/Parish's power of eminent domain. Mayor Screen, mistaken as to the legal rights of the City/Parish, and Director Addison took action they believed served the public welfare. We cannot say the trial court was manifestly erroneous or clearly wrong in concluding the personal injury was neither expected nor intended from the standpoint of the City/Parish in light of the evidence in this record.
Because Chicago has conceded that if F & C's underlying policy provided coverage, the Chicago policy likewise provides coverage, we conclude the trial court correctly determined the insurance coverage issue. We hold the F & C policy with its $400,000.00 limit provides coverage for all damages in excess of $100,000.00 and up to $500,000.00, and Chicago's excess policy provides coverage for all remaining damages.

C. Insurers' Liability for Legal Interest and Costs
The final issue raised by Chicago is that the trial court erred by holding it liable along with F & C for legal interest from the date of judicial demand, as well as attorney's fees and costs. Having concluded there is coverage for attorney fees, we examine the trial court's determination only insofar as it *38 casts Chicago liable along with F & C for legal interest and costs.
Chicago contends that the scope of coverage afforded to the City/Parish by its policy is solely for damages and expenses. It correctly points out that under the Supplementary Payments section of the F & C policy, F & C has obligated itself to pay "in addition to the applicable limit of liability" the following:
(a) all expenses incurred by [F & C], all costs taxed against the insured in any suit defended by [F & C] and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before [F & C] has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of [F & C's] liability thereon....
On appeal, F & C does not dispute its liability for interest and costs; however, Chicago urges that under the provisions of its policy its liability is for "all sums which the insured shall become obligated to pay as damages." (Emphasis added.) Therefore, Chicago contends that the trial court's determination holding it liable "for legal interest from the date of judicial demand, as well as... costs in accordance with the law and the policy provisions" is erroneous. Because the judgment specifies that Chicago is liable for interest and costs "in accordance with the law and the policy provisions," we find no error in the trial court's determination. However, because Chicago urges that it is not liable and, based on our review of the policy, we agree that under the terms of the Chicago policy it has not obligated itself for legal interest or costs, we will amend the judgment to read: "[F & C] shall be liable for legal interest from the date of judicial demand, as well as costs, in accordance with its policy provisions."

VIII. CONCLUSION
For the reasons set forth above, we amend the judgment as follows.
(1) The property damage award to Mr. and Mrs. Raby, in community, is reduced from $80,000.00 to $50,037.00;
(2) the award to Mr. and Mrs. Raby, in community, for the damage to their parking lot is increased from $50,000.00 to $51,860.00;
(3) the award to Huston Williams for damage to his personal property is increased from $500.00 to $1223.09;
(4) the award to Leroy Williams for damage to his personal property is increased from $150.00 to $350.00;
(5) insofar as the judgment awards costs and legal interest against F & C and Chicago, we amend the judgment to state, "[F & C] shall be liable for legal interest from the date of judicial demand, as well as attorney fees and costs in accordance with the law and its policy provisions."
In all other respects, the September 12, 1995 judgment is affirmed. Costs of this appeal in the amount of $5,643.72 are assessed against the City/Parish.
AMENDED IN PART, AND AS AMENDED, AFFIRMED.
KUHN, J., dissents and concurs in part.
LeBLANC, J., dissents in part.
KUHN, Judge, dissenting in part and concurring in part.
I must dissent from the position of the majority with regard to their determination that the trial court did not abuse its discretion in its awards of mental anguish.
It is well-settled that an award for mental anguish as a result of damage to property is normally permitted in four instances: (1) property damaged by an intentional or illegal act; (2) property damaged by acts for which the tortfeasor will be strictly or absolutely liable; (3) property damaged by acts constituting a continuous nuisance; and (4) property damaged at a time which the owner thereof is present or situated nearby and the owner experiences trauma as a result. Louisiana Farm Bureau Mut. Ins. Co. v. Dunn, 484 So.2d 853, 856 (La.App. 1st Cir.1986). Where the defendant trespasses upon plaintiff's property, it is clear plaintiff is entitled to recover damages for anguish, humiliation and embarrassment. Britt Builders, Inc. v. *39 Brister, 618 So.2d 899, 903 (La.App. 1st Cir. 1993).
After a review of the mental anguish awards made when property has been damaged, we find these awards range from a low of $100.00 to a high of $35,000.00. Bryant v. Sears Consumer Financial Corp., 617 So.2d 1191, 1195 (La.App. 3d Cir.1993); Cutrer v. Illinois Central Gulf Railroad Co., 581 So.2d 1013, 1022 (La.App. 1st Cir.1991), writ denied, 588 So.2d 1120 (La.1991). Based on this record, I believe the most the trial court could have awarded plaintiffs, without abusing its discretion, would be as follows:
Williams family plaintiffs:
Class ILouise Jackson: $35,000.00;
Class IIHouston Williams, Willie Williams, Leroy Williams, Bernice (Williams) Christopher, Gloria (Williams) Taylor and Alzetia (Williams) Davis: $11,000.00 each.
Gage family plaintiffs:
Class IBeatrice Gage Harris and Irma Gage Carr: $29,000 each;
Earline Gage Howard: $14,800.00;
Class IIOphelia Simmons, Evelyn Gage Sagna and Lubertha Ethel Gage Johnson: $11,000.00 each;
Ulysses Gage, Jr. and Leroy Gage for Ulysses Gage, Sr.: $7800.00;
Leonard Gage: $3900.00.
the Rabys:
John B. Raby: $35,000.00;
Ida Jane Raby: $29,000.00;
John Raby, Jr. and Kathy Raby: $9750.00 each.
In my opinion, the awards for mental anguish by the trial court, affirmed by the majority, appear to be punitive in nature. Accordingly, I dissent from that portion of the majority's opinion which affirms the trial court's awards for mental anguish.
I also dissent from the majority's award of attorneys' fees. For reasons that follow, I agree with the majority's conclusion that the actions of the City/Parish do not amount to violations under 42 U.S.C.A. § 1983. Therefore, attorneys' fees are not recoverable under a theory of civil rights violations. However, I disagree with the majority's conclusion that the City/Parish's actions amounted to a "taking," thereby supporting recovery under La.R.S. 13:5111. To the extent that the actions of the City/Parish constituted a "taking," defendants would be correct in their assertion that plaintiffs' recovery excludes non-physical damage. Reymond v. State, Dep't of Highways, 255 La. 425, 231 So.2d 375, 384 (1970). The physical damage which is recoverable to a plaintiff whose property has been taken by the City/Parish must be proximately caused by the improvement as designed and constructed or must be the probable, the immediate, the direct, and the necessary result and effect of the activities engaged in during the construction. Id. In my opinion, the majority's affirmance of the non-physical damage awards precludes an award of attorneys' fees under La.R.S. 13:5111. Because I believe, the excavation project undertaken by the City/Parish is not "a taking or damaging for public purposes" as contemplated by Art. 1, Sec. 4 of the Louisiana Constitution, but rather the ultra vires actions of elected and appointed officials for the City/Parish (which amount to the tort of trespass), attorneys' fees may not be awarded under La.R.S. 13:5111.
I concur with the remainder of the majority's opinion. I whole-heartedly agree with the majority's conclusion that the trial court erred in its determination that defendants are liable to plaintiffs under 42 U.S.C.A. § 1983 (see n. 30 of the majority opinion). I write separately, however, to suggest that trial court's conclusion that the actions of Mayor Screen and Director Addison were taken "under color of state law" is erroneous.
A civil remedy for violation of a person's constitutional rights is provided for in 42 U.S.C. § 1983. Section 1983 imposes liability for violations of rights protected by the United States Constitution, not for violations of duties of care arising out of state tort law. Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689-94 n. 3, 61 L.Ed.2d 433 (1979); Ross v. Sheriff of Lafourche Parish, 479 So.2d 506, 512 (La.App. 1st Cir.1985).
In order to hold the City/Parish liable under § 1983, plaintiffs must establish that (1) the actions of the City/Parish officials *40 involved here were taken under color of law; (2) the conduct caused a deprivation of plaintiffs' rights, privileges or immunities secured by the Constitution or laws of the United States; and (3) the conduct was the consequence of the "policy or custom" of the City/Parish. See, e.g., Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 664-65, 88 L.Ed.2d 662 (1986).
The United States Supreme Court construed the breadth of municipal liability under § 1983 in Pembaur v. City of Cincinnati, 475 U.S. 469, 482-83, 106 S.Ct. 1292, 1299-1300, 89 L.Ed.2d 452 (1986), wherein it held that municipal liability arises where and only where, a deliberate choice to follow a course of action is made from among various alternatives by the officials responsible for establishing final policy with respect to the subject matter in question. The fact that a particular officialeven a policymaking officialhas discretion in the exercise of particular functions does not, without more, give rise to municipal liability. Id. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law. Id.
In this case, the record fails to establish that the conduct of either Mayor Screen or Director Addison was the consequence of the official policy of the City/Parish, i.e., action "taken under state law."[1] Accordingly, I concur in the majority's conclusion that the trial court was erroneous in holding the City/Parish liable on a theory of recovery for violations of § 1983.
LeBLANC, Judge, dissenting in part.
I agree with the written reasons of Judge Kuhn, except that part which suggests the "most the trial court could have awarded....". I believe that the most the trial court could have awarded is far less than suggested by Judge Kuhn.
Otherwise, I agree with the remainder of his dissent.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The three plaintiff families are further divided into three groups in accordance with their relationships to the land. Class I plaintiffs are those who lived on the land on January 6, 1984. Class II plaintiffs, direct heirs of Class I plaintiffs, grew, up on the land and were frequent visitors to their family homes. Class III plaintiffs are the remaining heirs who had no direct contact with the land.
[3] The transcript identifies Officer Shavers' supervisor as "Major Satterwaite."
[4] The canal that runs in the front of all three tracts is an enlargement by DPW of the 1954 servitude ditch on the Gage tract; the enlarged canal continues through the front portions of the Raby and Williams tracts. It is undisputed the state has never been granted a servitude on either the Raby or the Williams property.
[5] No appeal was taken from the trial court's denial on September 17, 1991, of a peremptory exception raising the objection of prescription. According to the briefs, plaintiffs originally filed their lawsuits in federal court in December, 1984.
[6] Plaintiffs filed numerous amending and supplemental petitions. For brevity, we refer to all plaintiffs' petitions collectively as "the petitions."
[7] Mayor Screen died prior to the hearing on the motion for new trial and his estate was substituted as defendant.
[8] In brief, the Raby family urges the trial court erred in its determination insofar as it releases from liability the estate of Mayor Screen and defendant, William Addison. The Raby family also asserts in its brief that it is entitled to an award of punitive damages for civil rights violations. Lastly, the Raby family contends, in its brief to this court, that the trial court's award of interest on the judgment is erroneous. An answer only operates as an appeal from those aspects of the judgment of which the answer complains. Lilly v. Allstate Ins. Co., 577 So.2d 80, 86 (La.App. 1st Cir.1990), writ denied, 578 So.2d 914 (La.1991). Although the Raby family filed an answer in this appeal, the answer does not complain of these aspects of the judgment, and, therefore, we do not consider the issues raised in the Raby brief.
[9] Although La.R.S. 13:4231 was amended effective January 1, 1991, we apply the provisions of La.R.S. 13:4231 in effect at the time of filing.
[10] Additionally, the trial court determined that plaintiffs' rights of privacy under Art. 4, Sec. 1 of the Louisiana Constitution had been violated. Based on the evidence, we find ample support for the trial court's conclusion; however, because the awards of damages made by the trial court are fully supported under either a trespass or an invasion of privacy theory of recovery, we find it unnecessary to discuss both bases of recovery and limit our discussion to the City/Parish's liability for trespass.
[11] The mere fact that plaintiffs did not seek an injunction against the City/Parish at the time of their entry upon the land is not tantamount to consent. Nor are plaintiffs estopped from bringing an action in trespass by their alleged failure to mitigate their damages by seeking injunctive relief. See Pearce v. L.J. Earnest, Inc., 411 So.2d 1276, 1279 (La.App. 3d Cir.), writ denied, 414 So.2d 377 (La.1982). Defendants' reliance on Gray v. State Dep't. of Highways, 250 La. 1045, 202 So.2d 24 (1967), is misplaced, as the facts of that case are clearly distinguishable from those encountered here. Defendants' argument to the contrary on appeal is without merit.
[12] The trial court awarded $5,000.00 to the Williams family plaintiffs, and $4,000.00 to the Gage family plaintiffs for loss of trees. Although the parties have neither assigned nor specifically argued error, we note the evidence in this record supports these determinations and we, therefore, find no error with the awards. See Curole v. Acosta, 303 So.2d 530, 532 (La.App. 1st Cir. 1974).
[13] The judgment states, "For the heirs of Tom and Azrine Gage, in the name of Evelyn Gage Sagna, representative of the Succession of Tom and Azrine Gage." The record establishes that this reference is intended to include all members of the Gage family who have an ownership interest in the property. At the time of trial, plaintiffs were examining the title to ascertain the identities of all members of the Gage family who have an interest in the subject property.
[14] Submitted into evidence in conjunction with Mr. Russell's testimony were calculations outlining development costs a reasonable developer would have to expend to develop the land and the comparable sales of land subdivided in adjacent areas. Mr. Russell then calculated the total amount of sales the Gage property would yield and subtracted the development costs in his determination of the difference in the value to the Gage tract before and after the DPW excavation project.
[15] Based on this method of valuation, we find it unnecessary to address defendants' argument that the Gage family is entitled to recover nothing for the enlargement of the 1954 servitude ditch.
[16] Mr. Boudreaux testified the cost to restore both ditches located on the Gage property was $451,300.00.
[17] Based on our calculations of the figures Mr. Russell supplied of the development cost analysis for subdivision of the Williams tract, the difference in value of the land after the damage by the City/Parish was $49,272.50.
[18] At trial, the City/Parish asserted that the damage to the Raby parking lot was not caused by it, but by others who had been dumping fill at the rear of the subject property. In awarding damages, the trial court obviously rejected the City/Parish's assertion, relying instead on Mr. Raby's testimony that the DPW trucks caused the damage. While the parties have not assigned nor specifically argued error with this finding, in light of Mr. Raby's testimony, a reasonable factual basis exists to support it and therefore the trial court was not manifestly erroneous in so concluding.
[19] Defendants assert the trial court's awards of all damages except those for property and severance damages are erroneous. The crux of their argument is that a servitude of natural drain existed on the plaintiffs' property and that in conjunction with the City/Parish's police power, which includes the right of eminent domain, DPW entered plaintiffs' property in order to maintain the natural drain.

Defendants' argument overlooks the fact that an essential element of an exercise of eminent domain is whether the taking or damaging is for a public purpose under LSA-Const. Art. 1, Sec. 4. See State through DOTD v. Chambers Inv. Co., 595 So.2d 598, 603 (La.1992). Even though the governmental body exercising the power of eminent domain has wide discretion in determining the necessity and extent of a taking, this discretion is not unbridled. See State, Dep't. of Transportation & Development v. Estate of Griffin, 95-1464, p. 3 (La.App. 1st Cir. 2/23/96); 669 So.2d 566, 568. The location and extent of the taking, the nature of the title to be taken, and the wisdom of pursuing a particular improvement project relate to the issue of the necessity of the taking. Id. The governmental body should be in a position to justify and support with cogent reasons the taking for an appropriate purpose. See State v. Jeanerette Lumber & Shingle Co., 350 So.2d 847 (La.1977).
The excuse offered by the City/Parish in this case that they were maintaining the natural servitude of drain is far from cogent. The excavation project undertaken on the property of these plaintiffs far exceeded mere maintenance. In concluding defendants' liability arises under the tort of trespass, the trial court implicitly found the City/Parish acted arbitrarily and capriciously, and that its bad faith actions amounted to an abuse of its discretion in an attempted exercise of eminent domain. We agree. Our review of the record convinces us the trial court was not erroneous in its determination that the damage of the plaintiffs' property was not necessary and therefore not a proper exercise of eminent domain. Accordingly, there is no merit to the argument by defendants on appeal that the trial court erred in awarding damages under any theory of liability other than inverse condemnation, the theory of recovery used when a public body exercises its power of eminent domain without an expropriation. Likewise, our review of the record shows a reasonable factual basis exists to support the trial court's finding that the street flooding of Staring Lane on January 6, 1984, was not an emergency situation warranting use of the City/Parish's police powers in the manner it did.
Furthermore, even if plaintiffs could have brought an action in inverse condemnation, mental anguish damages would not have been excluded because the defendants are also liable for the tort of trespass.
[20] Defendants also argue on appeal that the trial court erred by awarding recovery for mental anguish under any theory of recovery. Our previous discussion of the damages allowed for trespass dispels this argument.
[21] In the award of $88,000.00 to Louise Jackson, the judgment states, "for mental anguish, inconvenience, embarrassment and continued nuisance...." Because title remains with Ms. Jackson, the City/Parish is not the "proprietor" of this property, as required under La.C.C. art. 667, so as to be liable for any nuisance damages the existence of the ditches may cause. Accordingly, we interpret the reference in the judgment to be merely descriptive of the mental anguish award.
[22] We interpret the use of the reference "loss of use and enjoyment" in some of the in globo awards as intending to compensate these Class I plaintiffs for general damages. While the reference "loss of use" has been utilized in compensating for property damages, See e.g., Hallar Enterprises Inc. v. Hartman, 583 So.2d 883 (La.App. 1st Cir.1991), in the case now before us, plaintiffs have made no claims for monetary losses associated with "loss of use" of their property.
[23] The judgment actually awards $9,500.00 to three Gage family members (Beatrice Gage Harris, Irma Gage Carr, and Lubertha Ethel Gage Johnson) "who were substituted on behalf of Earline Gage Howard" and further awards to "Ulysess Gage, Sr. & substituted as plaintiffs for their father: Leroy Gage ... and Ulysses Gage, Jr." $9,500.00 each, for a total of $47,500.00.
[24] The judgment does not designate the basis for the $20,000.00 award to Ulysses Gage, but the reasons for judgment indicate the award was for mental anguish.
[25] The judgment does not designate the basis for the $10,000.00 award to Leonard Gage, but the reasons for judgment indicate the award was made for mental anguish.
[26] Neither John Raby, Jr. nor Kathy Raby testified at trial; however, the trial court was advised that their testimony would be cumulative of Mrs. Ida Jane Raby's. We conclude that in awarding general damages to each, the trial court must have attributed Mrs. Raby's testimony to each of them.
[27] Plaintiffs also contend the awards for attorney's fees are abusively low.
[28] As noted above, the trial court initially determined neither insurer provided coverage to the plaintiffs for the damages sustained. On motions for new trial, raised by the City/Parish and the plaintiffs, the trial court reversed the earlier determination and found coverage. On appeal, relying on Pino v. Gauthier, 633 So.2d 638 (La. App. 1st Cir.1993), writs denied, 94-0243, 94-0260 (La. 3/18/94); 634 So.2d 858, 859, Chicago suggests that the trial judge's statement, "I grant your judgment notwithstanding the verdict ..." and other references at the hearing to "the motion for new trial" as "a judgment notwithstanding the verdict" require this court to reinstate the trial court's original factual findings, or to conduct a de novo review on the issue of coverage. Unlike Pino, there was never a jury impaneled in the case now before us. Moreover, from a review of the entirety of the record, it is clear the issue of coverage was raised and was properly before the trial judge, and that the trial judge's substantive rulings addressed the motion for new trial. Accordingly, we find Chicago's contention to be without merit.
[29] F & C and Chicago suggest that this court deviate from the general rules of insurance contract construction and apply the "sophisticated professional" exception as set forth in Indus. Risk Insurers v. New Orleans Public Ser., 666 F.Supp. 874 (E.D.La.1987). While neither of these insurers has cited the application of the "sophisticated professional" exception in Louisiana, this record is devoid of any evidence establishing that the City/Parish in obtaining this policy from F & C "had a significant impact in negotiating the terms of the policy." Thus, we find the "sophisticated professional" exception to be of no moment under the facts before us.
[30] A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, when execution of a government's policywhether made by its lawmakers or those whose acts represent official policyinflicts the injury, the government as an entity is responsible under § 1983. Monell v. New York City, Dept. of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978).
[31] La.R.S. 14:63.3 provides in relevant part:

A. No person shall without authority to go into or upon any ... immovable property, which belongs to another ... after having been forbidden to do so ... by the owner....
While in brief Chicago asserted that the City/Parish's conduct commencing on January 6, 1984, was in violation of Section 12:152 of the Baton Rouge Code of Ordinances, that ordinance did not become effective until October, 1994. Therefore, we apply the prior version, which was located in Chapter 4 of the Code of Ordinances. Section 150 of Chapter 4 states that "[i]t shall be unlawful for any person to commit trespass...." The term "trespass," defined in Sec. 152(a)(1), includes "[t]he unauthorized and intentional taking possession of any tract of land ... without the consent of the owner thereof...."
[32] "All of the damages" includes attorney fees. Although we did not calculate attorney fees on the mental anguish portion of the judgment, the taking pursuant to LSA-R.S. 13:5111 A could not have transpired without the trespass and invasion of property. In the instant case, the various theories of recovery are inextricably intertwined and cannot be isolated for coverage purposes.
[1] See the Plan of Government of the Parish of East Baton Rouge and City of Baton Rouge, §§ 4.03, 4.04 and Title 1 of the Baton Rouge Code of Ordinances, § 1:606, establishing the perimeters of official conduct for the office of Mayor/President, as to the actions of Mayor Screen. See the Plan of Government of the Parish of East Baton Rouge and City of Baton Rouge, §§ 5.01, 5.02, 5.04, and Title 1, Chapter 4, Part II, Secs. 1:601-607 of the Baton Rouge Code of Ordinances, establishing the perimeters of official conduct for the office of director of DPW, as to the actions of Director Addison (ostensibly ratifying the decision of Assistant Director Atkinson).